592 A.2d 205

STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
CHARLES IVORY, JR., DEFENDANT-APPELLANT.

Argued March 12, 1991—Decided July 11, 1991.

*Bernadette DeCastro,* Assistant Deputy Public Defender, argued the cause for appellant (*Wilfredo Caraballo,* Public Defender, attorney).

*Carol M. Henderson,* Deputy Attorney General, argued the cause for respondent (*Robert J. Del Tufo,* Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

GARIBALDI, J.

This appeal presents two questions regarding one statute, *N.J.S.A.* 2C:35–7. The first question asks what constitutes "school property used for school purposes." The second question asks whether, for the statute to apply, a defendant must intend to distribute a controlled dangerous substance within 1,000 feet of school property. The answer to each question lies in an analysis of the Legislature's intent.

I

On October 27, 1988, defendant, Charles Ivory, rode his bicycle down Newmann Springs Road in Red Bank, New Jer-

sey. He proceeded through a "park area" (as he described it) and neared the athletic field at the end of Pearl Street in Red Bank.

Count Basie Park contains the athletic field that Ivory rode by on his bicycle. The Board of Education of Red Bank owns Count Basie Park, which it currently leases to the Borough of Red Bank for recreational use. Red Bank is specifically mandated to assign the use of the field to the Red Bank school system and private or parochial schools in addition to the Department of Parks and Recreation and residents of Red Bank. The priority of the assignments is set forth in the lease agreement. In order to use the field for its athletic teams, Red Bank Catholic High School entered into a ten-year Participation and Contribution Agreement with the Borough under the user, priority-of-allocation rules in the Borough's lease. Under the agreement the school agreed to contribute $100,000 toward the renovation of the field and to pay approximately $34,000 annually for its use of the field. The agreement also specified that Red Bank Catholic High School's "use of the Athletic Field" would "be no less than [its] current use of the Athletic Field." Other, non-school-related recreational activities also take place in the field.

A police officer, acting pursuant to a previously-obtained warrant, stopped and searched Ivory as he rode his bicycle within 1,000 feet of the athletic field. The search revealed 16.98 grams of cocaine and an uncertain amount of marijuana in Ivory's jacket pocket. That discovery resulted in multiple drug charges against Ivory, the most salient for our purposes being the violations of *N.J.S.A.* 2C:35–7 (third degree possession of cocaine and marijuana with intent to distribute, while within 1,000 feet of school property).

On December 22, 1988, Ivory entered a *retraxit* plea of guilty to violation of *N.J.S.A.* 2C:35–7. He described the location of his arrest, acknowledged his possession of the drugs, and

admitted that he might have sold or passed them on to others later that evening.

The court *sua sponte* postponed Ivory's sentencing in order to decide whether Count Basie Field was "school property." It found that ownership of the Park by the Red Bank Board of Education made this facility "school property" under the statute. Believing that the statute "does not require anything other than that the property was owned by a board of education," the trial court imposed a four-year sentence with a one-year parole bar. The court also imposed various fines.

Ivory appealed. He also made a motion to supplement the record, which the Appellate Division denied. Despite the sparse record provided below, the Appellate Division addressed both the "property" and "purpose" criteria of *N.J.S.A.* 2C:35-7 and held that "the record establishes that Count Basie Park is owned by the Red Bank Board of Education and is regularly used for public and parochial school athletics; the fact that the property is leased to the municipality and is also used for non-school purposes does not render it other than 'school property' used for school purposes under *N.J.S.A.* 2C:35-7." The court also rejected Ivory's argument that the statute's scope is limited to those intending to distribute drugs within 1,000 feet of school property used for school purposes, holding that whether "he may not have intended to make distribution within 1,000 feet of school property is irrelevant."

We granted certification, 122 *N.J.* 398, 585 *A.*2d 398 (1990). We later granted a motion to expand the record to include the lease agreement between the Red Bank Board of Education and the Borough of Red Bank as well as the Participation and Contribution Agreement between the Borough and "St. James Church (Red Bank Catholic)." Based on the more substantial record, we affirm the judgment below.

## II

In determining a statute's meaning, we consider first the plain language of the statute. *Kimmelman v. Henkels &*

*McCoy, Inc.*, 108 *N.J.* 123, 128, 527 *A.*2d 1368 (1987). In pertinent part *N.J.S.A.* 2C:35–7 provides as follows:

Any person who violates subsection a. of *N.J.S.* 2C:35–5 by distributing, dispensing or possessing with intent to distribute a controlled dangerous substance or controlled substance analog while on any school property used for school purposes which is owned by or leased to any elementary or secondary school or school board, or within 1,000 feet of such school property or a school bus, or while on any school bus, is guilty of a crime of the third degree and shall, except as provided in *N.J.S.* 2C:35–12, be sentenced by the court to a term of imprisonment ... [in most cases,] the term of imprisonment shall include the imposition of a minimum term which shall be fixed at, or between, one-third and one-half of the sentence imposed, or three years, whichever is greater, during which the defendant shall be ineligible for parole.

\* \* \* \* \* \* \* \*

It shall be no defense to a prosecution for a violation of this section that the actor was unaware that the prohibited conduct took place while on or within 1,000 feet of any school property. Nor shall it be a defense to a prosecution under this section, or under any other provision of this title, that no juveniles were present on the school property at the time of the offense or that the school was not in session.

The statute discloses that the Legislature intended to impose strict liability and a mandatory jail term on a person who possesses narcotics with the intent to distribute them while on or within 1,000 feet of school property used for school purposes. That interpretation of *N.J.S.A.* 2C:35–7 is well-supported not only by the language of the statute but also by the legislative history and commentary. In interpreting a statute, a court must give "primary regard ... to the fundamental purpose for which the legislation was enacted." *New Jersey Builders Owners & Managers Ass'n v. Blair*, 60 *N.J.* 330, 338, 288 *A.*2d 855 (1972). Although *N.J.S.A.* 2C:35–7 is a penal statute, "the rule of strict construction does not warn that the manifestations of the Legislature's intent should be disregarded." *State v. Edwards*, 28 *N.J.* 292, 298, 146 *A.*2d 209 (1958).

Evidence of the Legislature's purpose in enacting *N.J.S.A.* 2C:35–7 is overwhelming. The Legislature determined that "in order to be effective, the battle against drug abuse and drug-related crime must be waged aggressively at every level." *N.J. S.A.* 2C:35–1.1c. The Legislature's battle plan called for "spe-

cial protection [of] children from the perils of drug-trafficking." *Ibid.*

The Legislature clearly intended to create drug "safety zones"

around schoolyards in recognition not only that children, who are often the targets of distributors, congregate there, but also that areas surrounding schools must be kept drug free if they are to serve as the primary medium for educating young people as to the dangers of drug use.

\*       \*       \*       \*       \*       \*       \*       \*

[T]his offense focuses entirely on the dangers associated with the infiltration of illicit drugs and drug trafficking activity into school safety zones.

"OFFICIAL COMMENTARY To The Comprehensive Drug Reform Act (Laws 1987, Chapter 106)," *reprinted in* 9 *Crim. Just. Q.* 149, 157 (1987) (hereinafter "Commentary").

The Legislature established "a permanent, 24–hour drug safety zone around schools, in recognition that children routinely congregate on school property and school yards, before and after the normal school day, and during summer recess and other vacation periods." *Ibid.* To achieve that purpose the Legislature sought to punish severely those who carried drugs into the safety zones established by the statute.

Today, we must decide, first, whether the Legislature intended that properties like Count Basie Park be included in the definition of the "safety zones" it established around "school property used for school purposes." Second, we decide whether this statute applies only to a defendant who has the specific intent to distribute the drugs within 1,000 feet of the school property or whether it applies to a defendant who has a general intent to distribute the drugs at some time and at no particular place.

A .

█ We find that Count Basie Park fits with the Legislature's understanding of "school property used for school purposes." *N.J.S.A.* 2C:35–7. A two-pronged inquiry (*i.e.*, "Is it school property?" and "Is it used for school purposes?") impli-

cates both the construction of the statute and its application in this case. In this way, we address concerns raised about the due process and fundamental fairness of the statute in the abstract and as applied.

There can be no doubt that Count Basie Park is "school property." The statute asks whether the property "is owned by or leased to any elementary or secondary school or school board." *N.J.S.A.* 2C:35–7. This property is owned by a school board and is leased to a secondary school. "[I]t does not matter for purposes of this section whether the school is public, private or parochial." Commentary, *supra,* 9 *Crim. Just. Q.* at 157. The presence of a non-academic intermediary leaseholder is irrelevant. *See State v. Baez,* 238 *N.J.Super.* 93, 98, 569 *A.*2d 268 (App.Div.1990) (complexities related to definitions of real-estate interest held by educational unit irrelevant).

The next question is: is this property "used for school purposes?" Defendant inexplicably reads into the statute a notion that to trigger the statute the property must be used "exclusively" or "primarily" for school purposes. He also implies that the Red Bank lease provision that states that "the Athletic Field shall be used for recreational purposes" precludes a finding that the Athletic Field fits within the Legislature's understanding of "for school purposes." Neither of those positions is persuasive.

First of all, the notion that the school property must be used exclusively or primarily for school purposes finds no support anywhere. The statute itself states that "it shall be no defense that no juveniles were present on the school property at the time of the offense or that the school was not in session." As the legislative history aptly demonstrates, the Legislature intended a twenty-four-hour-a-day, three-hundred-sixty-five-day-a-year safety zone. Commentary, *supra,* 9 *Crim. Just. Q.* at 157. That safety zone did not depend on the actual presence of children, and applied "before and after the normal school day, and during summer recess and other vacation periods." *Ibid.*

That arrangement reflects a desire to protect children who "routinely congregate on school property and school yards before and after the normal school day, and during summer recess and other vacation periods." *Ibid.* Assuming a one-hundred-eighty-day, ten-hour-a-day school year, even schools themselves are not in use for school purposes for over half the year. Moreover, schools routinely allow facilities to be used by local groups. The Legislature intended broad protection and certainly did not intend to protect only students in areas around a single-use facility.

Second, "recreational purposes" need not foreclose "school purposes." The Legislature understood that schools used some property for athletic or recreational events, and that such use nevertheless constituted use for school purposes. Indeed, the recognition of the intersection of those two is seen in the statute, other laws and in the lease. "The protected school safety zone includes ... playgrounds and athletic fields" associated with the school because children "congregate there" before, during and after school, during the summer and during other vacations. *See* Commentary, *supra,* 9 *Crim. Just. Q.* at 157. That provision recognizes the connection between pedagogy and play. So does Title 6 of the *New Jersey Administrative Code* (Education), which establishes guidelines for physical education and interscholastic sports competition. *See, e.g., N.J. A.C.* 6:29–3.1 to 6:29–3.4. Moreover, the lease concerning this very park links its recreational purpose to use by the Red Bank school system and private or parochial schools. As the Legislature surely recognized, educating young people to the dangers of drug use is the shared responsibility of the counselor, gym teacher, and coach alike. That the duties of the latter two could be broadly defined as "recreational" is insufficient to exclude the educational impact of the activities that they oversee. To succeed against drugs, the safety zone must be "permanent" and the education all-inclusive. *See* Commentary, *supra,* 9 *Crim.Jus.Q.* at 157 ("[A]reas surrounding schools must be kept drug free if they are to serve as the primary

the primary medium for educating young people as to the dangers of drug use."); *see also* W. Cary Edwards, "An Overview of the Comprehensive Drug Reform Act of 1987," 13 *Seton Hall Leg.J.* 5, 18 (1989) ("The Act establishes a drug "safety zone" around schools and schoolyards in recognition that our schools must serve as the primary medium for educating our youth and modifying widely-held, tolerant attitudes about drug use").

This record contains sufficient evidence to demonstrate that Red Bank Catholic actually used Count Basie Park for school purposes. We therefore sustain defendant's conviction. The existence of a "Participation and Contribution Agreement" between the Borough and "St. James Catholic Church (Red Bank Catholic High School)" is strong evidence that the park was and will be "used for school purposes."

Lest one be concerned that a simple paper record could not offer potential defendants the means "to ascertain their proximity to schools [or school property used for school purposes] and remove their illegal operations and activities from those specially protected areas," Commentary, *supra*, 9 *Crim. Just. Q.* at 157, we note the Agreement states that

> R.B.C.'s [Red Bank Catholic's] participation and use of the Athletic Field shall be no less than R.B.C.'s current use of the Athletic Field ...

That 1985 Agreement indicates a then-current, visible use that could not decrease, and could well increase, over the course of the ten-year agreement. Red Bank Catholic was a recognized "participating user of the Athletic Field including the Athletic Field's stadium, home and visitor locker room, facilities, baths, football field, and 400 meter cinder track, etc." As a "home" team, Red Bank Catholic's "current," non-diminishing use in 1988 (the time of Ivory's arrest) would have included practices, soccer games, football games, and some other events. At times the fields would even have been prepared "for the exclusive use of R[ed] B[ank] C[atholic]." The Borough of Red Bank would have received notification of all scheduled games, all rained-out games, and all make-up games. Home teams generally wear

uniforms that visibly identify their members and their school affliation. Nothing would indicate that the Red Bank Catholic Casey's did not follow that practice. The evidence of regular, visible and consistent use, combined with the existence of the Agreement, assures us that "persons of ordinary intelligence can comprehend what conduct is proscribed" when the legislature defines an offense by its proximity to such a place. *See State v. Morales*, 224 *N.J.Super.* 72, 76, 539 *A.*2d 769 (Law Div.1987).

We recognize that the Legislature was not overly concerned with fairness toward drug dealers. The application of the statute on these facts, however, causes us no anxiety. The Legislature defined a strict-liability crime in *N.J.S.A.* 2C:35-7 ("It shall be no defense to a prosecution under this section that the actor was unaware that the prohibited conduct took place while on or within 1,000 feet of any school property"). However, in eliminating the necessity of showing subjective knowledge that a defendant knew that he or she was on or within 1,000 feet of the school property, the Legislature did not eliminate the necessity that the law be objectively reasonable and be objectively, reasonably, and uniformly enforced. *See N.J.S.A.* 2C:35-1.1a.

*N.J.S.A.* 2C:35-7 will apply only where both prongs are met. The property must be "school property," meaning owned by or leased to a primary- or secondary-education entity. The property must also be "used for school purposes." Because a title, lease, or analogous "Participation and Contribution Agreement" will sometimes establish only the first prong, we must occasionally look for other indicia of actual use to satisfy the second prong. In most cases, like that of a school itself, or playgrounds immediately adjacent to the school, use "for school purposes" will be self-evident. In other cases, the property may be marked by signs, flags, or banners indicating the school use. Recently, many municipalities have posted "Drug Free School Zone" signs at the edges of the safety zones. All of

those would demonstrate actual use in cases in which supporting documents did not describe a then-current use.

Other situations involving less-immediately identifiable property uses may prove more ambiguous. In such cases, the courts could look to other evidence such as published schedules, newspaper accounts, photographs and the like to establish that such property is regularly, consistently, and actually "used for school purposes" and not merely owned by an educational entity. So long as there are indicia from which an objectively reasonable person could know that the school property was used regularly, consistently, and actually for school purposes, lack of knowledge by a drug dealer, or a stranger, or, for that matter, a resident that he or she is within 1,000 feet of school property is irrelevant. Under such circumstances prosecution of a defendant under this statute does not violate due process.

## B

■ Defendant also asserts that he is guilty only if the State proves that he intended to distribute the narcotics on or within 1,000 feet of the school property and not if he merely possessed narcotics that he intended to distribute elsewhere. The Appellate Division correctly concluded that the fact that defendant "may not have intended to make distribution within 1,000 feet of school property is irrelevant." The legislative language and contemporaneous explanation support that position.

*N.J.S.A.* 2C:35–7 imposes its enhanced sanction upon "any person who violates subsection a. of *N.J.S.* 2C:35–5 ... while on any school property used for school purposes." The Legislature intended a longer period of incarceration for "any person who violates *N.J.S.A.* 2C:35–5a while inside a drug safety zone." Commentary, *supra,* 9 *Crim. Just. Q.* at 157. The first step in determining whether *N.J.S.A.* 2C:35–7 has been violated is to see whether *N.J.S.A.* 2C:35–5a has been violated. The latter provision does not necessitate that one be shown to intend to distribute within any specific area or time frame.

After the elements of that offense have been established, one need only take out the tape measure to see if *N.J.S.A.* 2C:35–7 has been violated.

Case law also supports that conclusion. In *State v. Ogar,* 229 *N.J.Super.* 459, 467, 551 *A.*2d 1037 (App.Div.1989), the court noted that this "statute cannot be construed to condition a prosecution upon some 'functional relationship' between the commission of the alleged drug offense and the protected zone." Similarly, in *State v. Baez, supra,* 238 *N.J.Super.* at 97, 569 *A.*2d 268 the Appellate Division stated that "the conduct in question is made criminal when it occurs on or within 1,000 feet of property being used for elementary or secondary school purposes." Finally, in *State v. Bethea,* 243 *N.J.Super.* 280, 283, 579 *A.*2d 341 (App.Div.1990), the Appellate Division correctly concluded that a "defendant did not have to intend to distribute the drugs within the school zone in order to be convicted under *N.J.S.A.* 2C:35–7." Here, the criminal conduct (possession with intent to distribute, contrary to *N.J.S.A.* 2C:35–5a) occurred while on or within 1,000 feet of school property used for school purposes. That makes it a violation of *N.J.S.A.* 2C:35–7.

Finally, commentators as well support the conclusion that the Appellate Division's decision on this issue represents the state of the law. "Given a similar situation [*i.e.,* possessing drugs within a tavern within 1,000 feet of a school] under New Jersey law, a person in possession of drugs with intent to distribute could be prosecuted (even if there was no intention to actually distribute in the bar itself or otherwise within 1,000 feet of school property)." Miller, "New Jersey's Drug Free School Zone Law," 21 *Rutgers L.J.* 175, 189 (1989) (student note). In a similar vein, a former State Attorney General noted that nothing in the new Comprehensive Act changed or supplemented "the proofs necessary to establish that a defendant possessed a given substance 'with intent to distribute.'" W. Cary Edwards, "An Overview of the Comprehensive Drug Reform Act of 1987," *supra,* 13 *Seton Hall Leg. J.* at 21. Each supports the

view that to come under this statute a defendant need not be shown to have any specific intent to distribute the drugs at any given location.

We believe our result comports with legislative intent and focuses on the Legislature's target. The only affirmative defense that the Legislature provided demands that a person arrested within 1,000 feet of school property prove, by a preponderance of evidence, that he or she possessed narcotics within a private residence where no juvenile was present *and* that the offense did not involve distribution for profit. No other exceptions are allowed. Simply put, if one possesses drugs with the intent to distribute and happens to be anywhere (except in a private residence under the conditions just mentioned) within 1,000 feet of school property, the statutory proscription applies. *State v. Ogar, supra,* 229 *N.J.Super.* at 467, 551 *A.*2d 1037. Some would argue that the statute was never intended to apply to those like Charles Ivory who happened to be riding his bicycle through a safety zone. However, that is precisely what was intended. *See State v. Ogar, supra,* 229 *N.J.Super.* 459, 551 *A.*2d 1037. Although the Legislature surely intended to prevent people from selling drugs to and around school children, it also meant to ensure "that areas surrounding schools must be kept drug free if they are to serve as the primary medium for educating young people as to the dangers of drug use." Commentary, *supra,* 9 *Crim. Just. Q.* at 157. The insulation of those children was to be complete and total. *Ibid.* (it is no defense that children were not present, school was not in session, or that defendant was unaware of his/her proximity to school property).

Although this is a penal statute, strict construction "does not prevent a court from reading the statute in relation to the mischief and evil sought to be suppressed or prevent a court from giving effect to the terms of the statute in accordance with their fair and natural acceptation." *State v. Meinken,* 10 *N.J.* 348, 352, 91 *A.*2d 721 (1952). Clearly, the Legislature intended to create drug-free zones of safety where children

could be, learn and play free of the potential infection of drugs. One contaminating these safety zones is liable, regardless of whether he or she intended to infect those here or others elsewhere. Such a stance is legitimate and warranted in the effort to prevent primary- and secondary-school students in this state from using drugs. The statute presents a rational and reasonable approach by the Legislature to reduce drugs around schools.

Drug introduction itself makes the zones less safe, less insulated, and hence stalls the achievement of the legislative goal. That one did not plan to distribute within the zone is irrelevant. Drugs and school children are a volatile, explosive mix that the Legislature intended to keep separate.

The connection of the Count Basie athletic field and its use to the educational mission of the Red Bank Catholic High School establishes it as a protected "safety zone." The Legislature's explicit reference to "playgrounds and athletic fields" evidences a belief that "school purposes" include recess and practice as well as reading and printing. Commentary, *supra*, 9 *Crim. Just. Q.* at 157. If our schools are to "serve as the primary medium for educating our youth and modifying widely-held, tolerant attitudes about drug use," *supra*, 13 *Seton Hall Leg.J.* at 18, an understanding of how drugs can affect one's body is as important as an understanding of how they can affect one's mind. A school fulfills its purpose by affording enlightenment both in the locker-room and in the classroom.

Because defendant possessed cocaine and marijuana with the intent to distribute it when the police apprehended him within one thousand feet of school property used for school purposes, we affirm the judgment of the Appellate Division sustaining his conviction for violation of *N.J.S.A.* 2C:35–7.

CLIFFORD, J., concurring.

Had the troubling point on which Justice Stein's thoughtful dissent rests been raised by defendant when he entered his

plea, I might well join the dissenting opinion. It was not, so I do not.

I concur in the result.

STEIN, J., dissenting.

In 1987, the Legislature enacted *N.J.S.A.* 2C:35–7 to "create a permanent, 24–hour drug safety zone" around "school property used for school purposes." *Official Commentary to the Comprehensive Drug Reform Act (Laws 1987, Chapter 106), reprinted in 9 Crim. Just. Q.* 149, 157 (1987) *(Commentary )*. To accomplish that salutary purpose, it made drug trafficking within 1,000 feet of school property a strict-liability offense punishable even when children are not present or when school is not in session. *N.J.S.A.* 2C:35–7. The "school property" involved in this case, however, is Count Basie Park in Red Bank, a public park owned by the Red Bank Board of Education (Board) and used by both the public and Red Bank Catholic High School (Red Bank Catholic) for sports activities. Because the park is not identified as "school property," the critical issue raised by this appeal concerns the State's obligation under the due-process clause to " 'give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute.' " *Papachristou v. Jacksonville,* 405 *U.S.* 156, 162, 92 *S.Ct.* 839, 843, 31 *L.Ed.*2d 110, 115 (1972) (quoting *United States v. Harriss,* 347 *U.S.* 612, 617, 74 *S.Ct.* 808, 811, 98 *L.Ed.* 989, 996 (1953)).

I

The facts of the case are undisputed. In October 1987, defendant, Charles Ivory, Jr., was riding his bicycle through Count Basie Park. The police stopped and searched him pursuant to a six-day-old search warrant, finding cocaine and marijuana in his coat pocket. After his arrest, defendant admitted that he had planned to share the drugs with friends at a party that evening.

Defendant was charged with two counts of possession of a controlled dangerous substance (CDS) contrary to *N.J.S.A.* 2C:35–10, two counts of possession of CDS with intent to distribute contrary to *N.J.S.A.* 2C:35–5, and two counts of possession of CDS with intent to distribute within 1,000 feet of school property contrary to *N.J.S.A.* 2C:35–7. He pleaded guilty to one of the school-property distribution charges, and the other charges were dismissed.

The trial court postponed sentencing to consider whether ownership of Count Basie Park by the Board was sufficient to render it "school property" within the intent of *N.J.S.A.* 2C:35–7. Concluding that the park constituted "school property," the court sentenced defendant pursuant to the statute. The Appellate Division affirmed, adding that the park was "regularly used for public and parochial school athletic programs; the fact that the property * * * is also used for non-school purposes does not render it other than 'school property used for school purposes' within the meaning of *N.J.S.A.* 2C:35–7."

We granted defendant's request to supplement the record with the Lease Agreement between the Board and the Borough of Red Bank and the Participation and Contribution Agreement between the Borough of Red Bank and Red Bank Catholic. The evidence of "actual use" by Red Bank Catholic that the majority ascertains from the Participation and Contribution Agreement, *ante* at 590–591, demonstrates that Red Bank Catholic was authorized to use the field for school athletic purposes during specific hours designated in the agreement. However, the record reveals that residents of Red Bank were also authorized to use the field for non-school activities, such as Pop Warner football and Little League baseball. The majority nevertheless concludes that the public's use of the field is irrelevant to the inquiry whether the property is used for "school purposes," focusing on the legislative intent to create a permanent, twenty-four-hour school safety zone. *Ante* at 589. The majority confuses the statute's clear mandate that distribution on school property is punishable regardless of whether

children are present or school is in session with the threshold issue whether the park is indeed "school property used for school purposes." *N.J.S.A.* 2C:35–7.

## II

Although *N.J.S.A.* 2C:35–7 does not define the term "school property used for school purposes," the legislative history indicates that the protected zone includes all school property, including playgrounds and athletic fields, and extends 1,000 feet in all directions from the outermost boundaries of that property. *Commentary, supra,* 9 *Crim. Just. Q.* at 157. As noted, to effectuate its purpose, the Legislature made distribution within 1,000 feet of school property a strict-liability offense, observing that

[i]t is thus incumbent upon drug traffickers to ascertain their proximity to schools and remove their illegal operations and activities from these specially protected areas, or assume the risk and stern consequences for their failure to do so. [*Ibid.*]

Defendant's conduct in possessing a CDS with intent to distribute is already proscribed and punishable by statute. *See N.J.S.A.* 2C:35–5. The fact that this case concerns enhancement of criminal penalties does not alter the constitutional analysis. The protections of the due-process clause apply to all persons, not just those engaging in innocent conduct. Defendant's illegal conduct does not excuse the State from its obligation to provide constitutionally-adequate notice to defendant and others that possession of drugs within 1,000 feet of the athletic field located within Count Basie Park was subject to penalties. *See Grayned v. Rockford,* 408 *U.S.* 104, 108, 92 *S.Ct.* 2294, 2298, 33 *L.Ed.*2d 222, 227 (1972) ("[A]n enactment is void for vagueness if its prohibitions are not clearly defined. * * * [B]ecause we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly."); *State v. Lashinsky,* 81 *N.J.* 1, 18, 404 *A.*2d 1121 (1979) ("The

* * * question for purposes of [the] vagueness argument is whether the defendant was reasonably apprised, as a matter of common intelligence, in light of ordinary human experience, that his particular conduct was unlawful."). As the Supreme Court observed in *Connally v. General Construction Co.*, 269 *U.S.* 385, 46 *S.Ct.* 126, 70 *L.Ed.* 322 (1926):

> That the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties[ ] is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law. And a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law. [*Id.* at 391, 46 *S.Ct.* at 127, 70 *L.Ed.* at 328.]

*See also Lanzetta v. New Jersey*, 306 *U.S.* 451, 59 *S.Ct.* 618, 83 *L.Ed.* 888 (1939) (Court invalidated statute that penalized being "member of any gang" because term "gang" was unconstitutionally vague); *State v. Cameron*, 100 *N.J.* 586, 498 *A.*2d 1217 (1985) (interpretive problems posed by term "church" rendered statute in question vague as applied).

The record does not inform us, nor is it relevant, whether defendant himself was aware that he was within 1,000 feet of school property. *See N.J.S.A.* 2C:35–7. The constitutional prerequisite is that school use of the park be sufficiently apparent so as to be objectively ascertainable by the public. This record does not reveal the existence of signs or other notices indicating either that the area surrounding the athletic field was a "Drug–Free School Zone" or that the field was used by Red Bank Catholic for athletic events. As presented, the record indicates that defendant was apprehended while bicycling through a public park with athletic fields, without any other indication that the fields were "school property."

The majority concludes that the provisions of the agreements between the Borough of Red Bank, the Board, and Red Bank Catholic authorizing school use of the athletic fields were sufficient to establish that a "reasonable person could know that the school property was used regularly, consistently and

actually for school purposes," *ante* at 591–592, and that in ambiguous cases, evidence "such as published schedules, newspaper accounts, photographs and the like," *ante* at 592, is sufficient to establish that the property falls within the statutory prohibition. I strongly disagree. Other than the agreements authorizing school use, there is no evidence in this record of the extent to which the field was actually used for school purposes and no evidence of schedules, newspaper accounts, or photographs of school use. In my view, the scant evidence in this record utterly fails to satisfy the due-process requirement that " 'a person of ordinary intelligence [have] fair notice that his contemplated conduct is forbidden by the statute.' " *Papachristou v. Jacksonville, supra,* 405 *U.S.* at 162, 92 *S.Ct.* at 843, 31 *L.Ed.*2d at 115 (quoting *United States v. Harriss, supra,* 347 *U.S.* at 617, 74 *S.Ct.* at 812, 98 *L.Ed.* at 996). Even if there were such published reports memorializing a school's use of the property, they would be insufficient to constitute the "fair notice" that the Constitution requires.

The issue is strikingly different from that presented in the cases holding, with respect to similar statutory provisions, that the due-process clause does *not* require proof of a defendant's knowledge that the offending activity occurred within 1,000 feet of school property. *See, e.g., United States v. Holland,* 810 *F.*2d 1215, 1224 (D.C.Cir.) ("[I]t is reasonable for Congress to have expected drug traffickers to ascertain their proximity to schools and remove their operations from these areas or assume the risk for their failure to do so."), *cert. denied,* 481 *U.S.* 1057, 107 *S.Ct.* 2199, 95 *L.Ed.*2d 854 (1987); *United States v. Falu,* 776 *F.*2d 46, 50 (2d Cir.1985) (same reasoning); *State v. Moore,* 782 *P.*2d 497, 504 (Utah 1989) (same reasoning with respect to state legislature). In those cases, there was no ambiguity or uncertainty concerning the existence of the school or school property. Hence, courts understandably have concluded that the due-process clause is not offended by a lack of proof that defendant knew his unlawful conduct occurred within a prescribed distance from school property. In this case,

because the actual use of the park as school property was not objectively ascertainable, fundamental principles of due process preclude the statute's application to this defendant. Under the Constitution, not even the Legislature can turn a park into a school. At the very least, the State's obligation is to provide adequate notice that the park is used as school property.

I cannot conclude from this record that it was objectively ascertainable that Count Basie Park was "school property used for school purposes" within the meaning of *N.J.S.A.* 2C:35–7. Hence, there was not an adequate factual basis for the trial court to have accepted defendant's guilty plea. I would reverse defendant's conviction and remand the case to the Law Division for trial.

*For affirmance* —Chief Justice WILENTZ and Justices GARIBALDI, CLIFFORD, HANDLER, POLLOCK and O'HERN—6.

*For reversal and remandment* —Justice STEIN—1.