264 N.J. Super. 102 (1993)
624 A.2d 48
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
RYAN LEE ALEXANDER, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued February 10, 1993.
Decided April 27, 1993.
*104 Before Judges HAVEY, STERN and BROCHIN.
Mordecai Garelick, Assistant Deputy Public Defender, argued the cause for appellant (Zulima v. Farber, Public Defender, attorney; Mr. Garelick, of counsel and on the brief).
Appellant filed a supplemental pro se brief.
Paul B. Brickfield, First Assistant Prosecutor, argued the cause for respondent (John J. Fahy, Bergen County Prosecutor, attorney; Mr. Brickfield, of counsel and on the brief).
The opinion of the court was delivered by BROCHIN, J.A.D.
Defendant Ryan Lee Alexander was convicted of possession of cocaine (N.J.S.A. 2C:35-10a(1)); possession of cocaine with intent to distribute it (N.J.S.A. 2C:35-5a(1) and 5b(3)); and being the leader of a narcotics trafficking network (N.J.S.A. 2C:35-3, the "kingpin" statute[1]). For the latter offense, he was sentenced to *105 life imprisonment with twenty-five years' parole ineligibility; for the other two convictions, he was sentenced to concurrent terms of five years' imprisonment.
Defendant's arrest and indictment resulted from information that Anthony Harewood and Sandra Palmer provided to the police after their arrest for having sold nine baggies of cocaine to an undercover investigator for $100. When they were arrested, Harewood had $314.02 in cash in his pocket and Palmer had a large glassine bag containing 7.34 grams of cocaine in forty-eight smaller ziploc baggies. They told the police that defendant had recruited Harewood to sell cocaine. Defendant would supply Harewood daily with thirty to sixty bags of cocaine for resale. Palmer would hold the drugs and Harewood, who lived with her and was the father of three of her children, would collect the money from buyers whom defendant directed to him. According to Harewood, he would give defendant between $300 and $1500 a day; Palmer said that Harewood would pay defendant approximately $5000 a week and keep approximately $2000 a week as profit.
The statements which Harewood and Palmer gave to the police identified the apartment where defendant stored and sold cocaine. Pursuant to a warrant, the police entered and searched the apartment. Defendant was inside. While he was attempting to *106 turn on a light, he dropped a bag in which there were 42 smaller, green, ziploc baggies containing 11.08 grams of cocaine that looked like the baggies found in Palmer's possession when she was arrested.
Harewood's and Palmer's statements to the police were read to the jury. Harewood's statement said:
I met Ryan Alexander and Chris Kittrell inside 55 Railroad Avenue, Apartment A-4. Both of these guys had approximately 160 bags of cracks. They got me forty-eight bags of crack. I then gave these forty-eight bags to Sandra Palmer who hides these cracks on her body. I make $30 for every $100 of crack that I sell for Ryan and Chris. These guys sell the crack sometimes right out the window, while they stay inside. They are slick! They have over one hundred bags of cracks right now in their possession. I just seen the cracks minutes before you arrested me. I work for Ryan and Chris.
Palmer's statement said:
I have forty-eight bags of cracks which Anthony Harewood, my boyfriend, gave to me. He just received them from Ryan Alexander and Chris Kittrell in Didi's [i.e., Alexander's girlfriend's] apartment. Ryan and Chris have been selling crack out of there since they were released from jail. They started as soon as they got out. They sell to everyone. I seen them sell to people, even juveniles over fifty times. They brag [they] own the block. They use Didi's apartment to sell their crack right out the window.
On appeal, defendant contends that reading Palmer's statement to the jury was prejudicial error because it revealed that he had been in jail and had sold crack to juveniles; that the prosecutor impermissibly expressed his own personal opinion, without support in the evidence, when he told the jury during summation that the small ziploc bags taken from Palmer were "unique" and of a type that he "had never seen before"; that N.J.S.A. 2C:35-3, the "kingpin" statute, is unconstitutionally vague; and that the court's jury instructions failed to distinguish between that offense and such lesser offenses as distributing or conspiring to distribute a controlled dangerous substance. Defendant also alleges that his convictions for possession and for possession with intent to distribute should have been merged, and that the mandatory DEDR penalty to which he was sentenced constituted cruel and unusual punishment.
*107 We turn first to defendant's arguments attacking his conviction for violating N.J.S.A. 2C:35-3. The statute says:
A person is a leader of a narcotics trafficking network if he conspires with others as an organizer, supervisor, financier or manager, to engage for profit in a scheme or course of conduct to unlawfully... distribute [certain controlled dangerous substances].
We reject the argument that the terms "organizer, supervisor, financier or manager" are unconstitutionally vague. The statute has been upheld against challenge on that ground in our unpublished opinions in State v. Burgess, A-5319-89T4 (App.Div. Feb. 16, 1993); State v. Taylor and Harris, A-4265-89T2 and A-4368-89T2 (App.Div. Feb. 19, 1992), certif. denied, 130 N.J. 10, 611 A.2d 649 (1992); and State v. Afanador, A-4086-88T3 (App.Div. Dec. 19, 1991), certif. granted, 130 N.J. 601, 617 A.2d 1222 (1992). The latter case is currently pending before the Supreme Court. We are content to follow our prior decisions on this issue.
Those decisions do not dispose of defendant's challenge to his conviction under N.J.S.A. 2C:35-3 on the ground of the alleged inadequacy of the jury charge. That ground of appeal was not asserted before the trial court, but we will consider it because of the severity of the sentence to which defendant is subject if his conviction under that section is sustained. See State v. Ricci, 250 N.J. Super. 39, 43, 593 A.2d 362 (App.Div. 1991), certif. denied, 127 N.J. 547, 606 A.2d 362 (1991). Moreover, "[c]orrect charges are essential to a fair trial" and inadequate instructions on material points are presumed to be reversible error. State v. Martin, 119 N.J. 2, 15, 573 A.2d 1359 (1990).
N.J.S.A. 2C:35-3 was enacted as part of the Comprehensive Drug Reform Act of 1986. See N.J.S.A. 2C:35-1. That Act makes a section -3 violation its most serious offense, imposing a mandatory penalty of life imprisonment with 25 years' parole ineligibility on a defendant convicted as "a leader of a narcotics trafficking network." Even N.J.S.A. 2C:35-9, which imposes strict liability for drug induced deaths, is defined as an ordinary first degree offense punishable by 10 to 20 years' imprisonment. Similarly, "any person who knowingly maintains or operates any *108 ... facility used for the manufacture of" the enumerated illegal drugs or who "knowingly aids, promotes, finances or otherwise participates in the ... operations of such ... facility" contrary to N.J.S.A. 2C:35-4, is guilty of a first degree crime and subject to from ten to twenty years' imprisonment with mandatory parole ineligibility for from one-third to one-half of that time; a conspirator to violate section -4 would be guilty of a second-degree crime punishable by imprisonment for from five to ten years. N.J.S.A. 2C:5-4(a). Someone convicted for violating N.J.S.A. 2C:35-5 by manufacturing or distributing the drugs enumerated in N.J.S.A. 2C:35-3 is subject to punishment for a first, second or third degree crime, depending on the kind and amount of the drugs involved. A defendant convicted of employing a juvenile in his manufacturing or distribution scheme, contrary to N.J.S.A. 2C:35-6, is subject to punishment for a second degree crime.
If N.J.S.A. 2C:35-3 is read literally, the only evidence required to establish its violation is proof that the defendant "conspire[d] with others as an organizer, supervisor, financier or manager, to engage for profit in a ... course of conduct to unlawfully manufacture ... [or] distribute" the controlled dangerous substances enumerated in the statute. Anyone who initiated, supervised, financed or managed a two-person conspiracy to produce or sell any quantity of the specified illegal drugs would be subject to a mandatory penalty of life-imprisonment as "a leader of a narcotics trafficking network." That was substantially what the trial court instructed the jury in the present case.
Under this literal construction of N.J.S.A. 2C:35-3, anyone who has violated N.J.S.A. 2C:35-6 (employing a juvenile), anyone whose violation of N.J.S.A. 2C:35-4 (maintaining or operating a controlled dangerous substance production facility) involved more than a one-person facility, and anyone who participated in a conspiracy to violate N.J.S.A. 2C:35-5 (manufacturing, distributing or dispensing) and was not entirely subordinate to his co-conspirator and without any discretion of his own would also be guilty of violating N.J.S.A. 2C:35-3 (leader of narcotics trafficking network). In our view, an interpretation of section -3 which *109 makes "a leader of a narcotics trafficking network" largely indistinguishable from someone who violates or conspires to violate one of these other sections of the drug laws would be unfaithful to the legislative purpose evidenced by the structure of the Comprehensive Drug Reform Act of 1986.
The Declaration of Policy and Legislative Findings enacted as part of the Act state in part:
In order to be effective, the battle against drug abuse and drug-related crime must be waged aggressively at every level along the drug distribution chain, but in particular, our criminal laws must target for expedited prosecution and enhanced punishment those repeat drug offenders and upper echelon members of organized narcotics trafficking networks who pose the greatest danger to society. In order to ensure the most efficient and effective dedication of limited investigative, prosecutorial, judicial and correctional resources, it is the policy of this State to distinguish between drug offenders based on the seriousness of the offense, considering principally the nature, quantity and purity of the controlled substance involved, and the role of the actor in the overall drug distribution network. It is the intention of the Legislature to provide for the strict punishment, deterrence and incapacitation of the most culpable and dangerous drug offenders....
The 1987 Legislative Commentary to N.J.S.A. 2C:35-3 relates that declaration of intent to the statutory section with which we are concerned:
The express purpose of this section is to target for enhanced punishment the upper echelon members, the so-called kingpins, of an organized drug distribution scheme.
Referring to these declarations of legislative intent, Cannel, New Jersey Criminal Code Annotated, Comment on N.J.S.A. 2C:35-3 (1992), observes:
[N.J.S.A. 2C:35-3] is new, but it bears a functional resemblance to such sections as 2C:20-7.1b (dealing in stolen property) and 2C:5-2g (leader of organized crime). Those sections, like this one, include terms such as organizer, supervisor, manager etc. and limit the 2C:1-8 doctrines of merger. The clear organized crime direction of those other sections, as well as the purpose expressed in 2C:35-1.1c to punish severely "upper echelon members of organized narcotics trafficking networks" indicate a legislative intent that the section be read narrowly and not applied to every drug sale operation.... In the absence of this context, the section could be read to provide a mandatory life term with a 25 year minimum for almost every street-level dealer. [Emphasis added.]
The operative language of N.J.S.A. 2C:35-3 is "A person is a leader of a narcotics trafficking network if he conspires with others...." (Emphasis added.) In the light of the express legislative purpose, we construe "leader" as referring to "an upper *110 echelon member" and "network," to an "organized drug trafficking network." These are the key phrases which distinguish an accused who is properly subject to N.J.S.A. 2C:35-3 from someone who is punishable only under some other section as a street-level dealer.
Webster's Third New International Dictionary, Unabridged 718 (Philip Gove ed., 1986), defines "echelon" as "one of a series of levels or grades (as of leadership or responsibility) in an organization or field of activity." It defines "network" as "an interconnected or interrelated chain, group or system (as of secret agents)." Id. at 1520. Webster's Dictionary of English Usage 380-381 (E. Ward Gilman ed., 1989), says of echelon:

Echelon is originally a French word meaning literally "a rung on a ladder." It was borrowed into English in the 18th century in a figurative sense denoting a step-like military formation, and it remained primarily a military word for about 150 years thereafter, developing several additional senses during that time. One military sense it had developed by the end of World War II was "a level in a chain of command" [Example omitted.] In this sense, echelon began to appear commonly in general publications: [Example omitted.] And it quickly came to be applied to civilian as well as military organizations: [Example omitted.] This is now the common use of echelon.

That source sheds no additional light on the meaning of "network," but The Oxford Companion to the English Language, 686-687 (Thomas McArthur ed., 1992), defines this term as follows: "A construct in which threads, wires, or other materials are arranged as or like a net; anything analogous (a railway network, a police network)."
A jury called upon to determine whether a defendant is a "leader of a narcotics trafficking network" within the meaning of N.J.S.A. 2C:35-3 should be instructed, in substance, that to justify conviction, the State must prove beyond a reasonable doubt that during the period alleged in the indictment the defendant functioned as an "upper echelon member" of an organized "drug trafficking network" and, in that capacity, conspired "with others as an organizer, supervisor, financier or manager to engage for profit in a scheme or course of conduct to unlawfully manufacture, distribute, dispense, bring into or transport in this State" any of *111 the controlled dangerous substances enumerated in the statute. "Organized `drug trafficking network'" should be defined as a group of individuals who, by reason of their number and interrelationships, constitute a structured organization or system engaged in the manufacture or distribution of illegal drugs. "Upper echelon member" should be defined as someone who stands on an upper level of the chain of command of a drug trafficking network, exercising command authority over members of that organization whose status is subordinate to his. An "upper" level is a level which is superior to street-level distributors and to their immediate supervisors or suppliers.[2]
An instruction of this sort was not given to the jury in the present case. The jury therefore did not determine whether defendant's status and activities warranted the punishment which the Legislature has reserved for a "leader of a narcotics trafficking network." Consequently, we reverse defendant's conviction for violation of N.J.S.A. 2C:35-3 and remand the case for retrial of that charge.
As to defendant's remaining grounds of appeal, the State concedes that his conviction for possession of cocaine as charged in the seventh count of his indictment should be merged into his conviction for possession of cocaine with intent to distribute it as charged in the sixth count. The constitutionality of the mandatory DEDR penalties imposed on defendant was upheld in State v. Lagares, 127 N.J. 20, 601 A.2d 698 (1992). Reading Harewood's and Palmer's statements into evidence without redaction and the prosecutor's improper argument to the jury about the uniqueness of the packaging of the drugs found on Palmer were harmless errors insofar as his convictions for possession and possession with intent to sell are concerned.
Defendant's conviction for possession of cocaine, N.J.S.A. 2C:35-10(a)(1), is merged into his conviction for possession of *112 cocaine with intent to distribute it, N.J.S.A. 2C:35-5(a)(1) and -5(b)(3). His conviction and sentence for possession of cocaine with intent to distribute it are affirmed. His conviction as a leader of a drug trafficking network, N.J.S.A. 2C:35-3, is reversed and remanded to the trial court for further proceedings consistent with this opinion.
NOTES
[1] The count of the indictment which charged defendant with a violation of N.J.S.A. 2C:35-3 alleges that:

... Ryan Lee Alexander ... between August 30, 1989 and October 21, 1989 ... did conspire with Anthony D. Harewood and Sandra Palmer and C.K., an unindicted co-conspirator, known to the grand jury as an organizer, supervisor, financier or manager, to engage for profit in a scheme or course of conduct to unlawfully manufacture, distribute, dispense, bring into or transport in this State, cocaine or a Schedule II controlled dangerous substance thereof, contrary to the provisions of N.J.S. 2C:35-3....
The grand jury presumably intended to allege that defendant conspired "as an organizer, supervisor, financier or manager ....," not that C.K., one of the persons with whom he conspired had that status or performed one of those functions. Literally read, the indictment as returned is susceptible of the latter interpretation and is therefore ambiguous. However, the trial record demonstrates that both parties understood the indictment without difficulty as it was undoubtedly intended.
[2] In Richard Price, Clockers (1992), "Rodney" may be a "leader of a drug trafficking network" within the meaning of N.J.S.A. 2C:35-3; "Strike" is not.