643 A.2d 996

STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. RYAN
LEE ALEXANDER, DEFENDANT-RESPONDENT.

Argued January 19, 1994—Decided July 19, 1994.

*Stuart A. Minkowitz,* Assistant Prosecutor, argued the cause for appellant (*John J. Fahy,* Bergen County Prosecutor, attorney; *Mr. Minkowitz* and *Susan W. Sciacca,* Assistant Prosecutor, of counsel and on the brief).

*Mordecai Garelick,* Assistant Deputy Public Defender, argued the cause for respondent (*Zulima V. Farber,* Public Defender, attorney).

*Robin Parker,* Deputy Attorney General, argued the cause for *amicus curiae* Attorney General of New Jersey (*Deborah T. Poritz,* Attorney General, attorney).

*Lawrence S. Lustberg* argued the cause for *amicus curiae* Association of Criminal Defense Lawyers of New Jersey (*Crummy, Del Deo, Dolan, Griffinger & Vecchione,* attorneys; *Mr. Lustberg* and *Jonathan Romberg,* on the brief).

The opinion of the Court was delivered by

HANDLER, J.

A jury convicted defendant of several drug-related offenses, including a charge of violating *N.J.S.A.* 2C:35-3, commonly known as the "drug kingpin" statute. The Appellate Division reversed the "drug kingpin" conviction because it found error in the trial court's instructions to the jury. 264 *N.J.Super.* 102, 107-11, 624 A.2d 48 (1993). Specifically, the court below held that in a prosecution for violation of *N.J.S.A.* 2C:35-3, the trial court must instruct the jury that the State bears the burden of proving that "the defendant functioned as an 'upper echelon member' of an organized 'drug trafficking network' ...," *id.* at 110, 624 A.2d 48, and must define for the jury certain other terms contained in the statute, *id.* at 109-10, 624 A.2d 48. We granted the State's petition for certification, 134 *N.J.* 564, 636 A.2d 522 (1993), to review that determination.

I

Defendant, Ryan Lee Alexander, hired Anthony Harewood to sell crack cocaine in Hackensack, introduced Harewood to his

customers, and supplied Harewood daily with thirty to seventy baggies of crack. Harewood sold the baggies at $10 each and gave seventy percent of his gross receipts to defendant or to Chris Kittrell, defendant's cousin and an unindicted coconspirator. Harewood's paramour, Sandra Palmer, assisted him by carrying the crack and by delivering the drugs to buyers after they had paid Harewood. Making between $300 and $1,500 per day, Harewood gave up to $5,000 per week to Alexander, and kept up to $2,000.

A confidential informant identified Harewood to an undercover narcotics officer as a drug seller. The officer gave $100 to Harewood, who directed him to Palmer for completion of the drug transaction. Palmer gave the officer nine baggies containing what was later identified as crack cocaine. When Harewood and Palmer were arrested, they had 7.34 grams of cocaine contained in nine $100 baggies and $341.02 in cash. They identified defendant as their supplier, described the commission arrangement, and said that they had sold crack five to six days per week. A search of defendant's apartment yielded 11.08 grams of cocaine contained in forty-two baggies that matched those sold by Harewood and Palmer. The State charged Alexander with possession of cocaine in violation of *N.J.S.A.* 2C:35–10a(1); with possession of cocaine with intent to distribute contrary to *N.J.S.A.* 2C:35–5a(1) and –5b(3); and with being a leader of a drug-trafficking network in violation of *N.J.S.A.* 2C:35–3. The State also charged Harewood and Palmer with various counts of possession of cocaine and of possession of cocaine with intent to distribute.

At trial, Harewood and Palmer testified against defendant, and the jury convicted him on all counts. The trial court sentenced defendant to the mandatory term of life imprisonment with a twenty-five-year parole disqualifier on his conviction for being a leader of a narcotics-trafficking network, and to two five-year sentences on the charges of possession of cocaine and possession of cocaine with intent to distribute, to run concurrently with the life sentence.

The Appellate Division affirmed in part and reversed and remanded in part. Other than merging defendant's conviction for possession of cocaine into his conviction for possession of cocaine with intent to distribute, the court below rejected all defendant's arguments except those directed at the *N.J.S.A.* 2C:35–3 charge. That statute provides in pertinent part as follows:

A person is a leader of a narcotics trafficking network if he conspires with others as an organizer, supervisor, financier or manager, to engage for profit in a scheme or course of conduct to unlawfully manufacture, distribute, dispense, bring into or transport in this State methamphetamine, lysergic acid diethylamide, phencyclidine or any controlled dangerous substance classified in Schedule I or II, or any controlled substance analog thereof. Leader of narcotics trafficking network is a crime of the first degree and upon conviction thereof * * * a person shall be sentenced to an ordinary term of life imprisonment during which the person must serve 25 years before being eligible for parole. * * *

Notwithstanding the provisions of *N.J.S.A.* 2C:1–8, a conviction of leader of a narcotics trafficking network shall not merge with the conviction for any offense [that] is the object of the conspiracy. * * *

It shall not be necessary in any prosecution under this section for the State to prove that any intended profit was actually realized. The trier of fact may infer that a particular scheme or course of conduct was undertaken for profit from all of the attendant circumstances, including but not limited to the number of persons involved in the scheme or course of conduct, the actor's net worth and his expenditures in relation to his legitimate sources of income, the amount or purity of the specified controlled dangerous substance or controlled dangerous substance analog involved, or the amount of cash or currency involved.

[*N.J.S.A.* 2C:35–3.]

Correctly anticipating this Court's decision in *State v. Afanador*, 134 *N.J.* 162, 631 *A.*2d 946 (1993), the Appellate Division upheld the validity of *N.J.S.A.* 2C:35–3 against defendant's "vagueness" attack. 264 *N.J.Super.* at 107, 624 *A.*2d 48. It reversed and remanded for retrial on the "leader of a drug trafficking network" charge, however, not only because the trial court had failed to tell the jury that it must find that Alexander had functioned as an upper-echelon member of an organized network, *id.* at 110, 624 *A.*2d 48, but also because the court had not furnished the jury with adequate definitions of certain critical terms contained in *N.J.S.A.* 2C:35–3 and in *N.J.S.A.* 2C:35–1.1, the Legislature's statement of purpose. According to the Appellate Division, a correct jury instruction should define " '[o]rganized "drug trafficking net-

work" ' ... as a group of individuals who, by reason of their number and interrelationships, constitute a structured organization or system engaged in the manufacture or distribution of illegal drugs," *id.* at 111, 624 A.2d 48, and should define " '[u]pper echelon member' ... as someone who stands on an upper level of the chain of command of a drug trafficking network, exercising command authority over members of that organization whose status is subordinate to his." *Ibid.* Finally, the Appellate Division held that the jury charge should define an "upper" level as "a level [that] is superior to street-level distributors and to their immediate supervisors or suppliers." *Ibid.*

On its appeal to this Court from the Appellate Division's reversal of the *N.J.S.A.* 2C:35–3 conviction, the State argues that the court below erred by "engraft[ing] a declaration of legislative policy onto the drug kingpin statute so as to redefine the elements of the offense," and by requiring that the jury find beyond a reasonable doubt that the State had established each of those newly-defined elements. Hence, this appeal presents squarely the issue that we deferred examining in *Afanador, supra,* 134 *N.J.* at 179, 631 A.2d 946, namely, the requirements for a correct jury charge in a "leader of a drug trafficking network" prosecution under *N.J.S.A.* 2C:35–3.

II

*N.J.S.A.* 2C:35–3 is an unusually-constructed criminal statute. It describes the offense by giving a label to the offender: leader of a narcotics-trafficking network. It then lists the activities that will result in one being branded with that label, namely, (1) that the defendant conspired with at least two others; (2) that the defendant was an organizer, supervisor, financier, or manager; (3) that the defendant engaged in the conspiracy for profit; and (4) that the conspiracy included a scheme or course of conduct unlawfully to manufacture, distribute, dispense, or transport a controlled dangerous substance or analog. Those enumerated activities constitute the material elements of the crime. *See*

*N.J.S.A.* 2C:1–14(i) (stating that "a material element" of crime is a requirement that relates solely to crime itself), and 2C:1–14(h)(a) and (b) (stating that "element of the offense" includes "conduct" that is part of "definition of the offense" and also "establishes the required kind of culpability"); *N.J.S.A.* 2C:2–2(a) (stating that no person can be guilty of offense "unless he acted purposely, knowingly, recklessly, or negligently as the law may require, with respect to each material element of the offense"); *State v. Gerald,* 113 *N.J.* 40, 141, 549 *A.*2d 792 (1988) (O'Hern, J., concurring) ("The material elements of an offense vary in that they may involve (1) conduct *per se,* (2) the attendant circumstances of conduct, or (3) the result of conduct.").

When the Legislature enacted the "Comprehensive Drug Reform Act of 1986," *L.* 1987, *c.* 106, it included a statement of policy that is set forth at *N.J.S.A.* 2C:35–1.1. That statement declares in part that

to be effective, the battle against drug abuse and drug-related crime must be waged aggressively at every level along the drug distribution chain, but in particular, our criminal laws must target for expedited prosecution and enhanced punishment those repeat drug offenders and upper echelon members of organized narcotics trafficking networks who pose the greatest danger to society.... [T]o ensure the most efficient and effective dedication of limited investigative, prosecutorial, judicial and correctional resources, it is the policy of this State to distinguish between drug offenders based on the seriousness of the offense, considering principally the nature, quantum and purity of the controlled substance involved and the role of the actor in the overall drug distribution network. It is the intention of the Legislature to provide for the strict punishment, deterrence and incapacitation of the most culpable and dangerous drug offenders.

In *Afanador, supra,* 134 *N.J.* 162, 631 *A.*2d 946, this Court held that *N.J.S.A.* 2C:35–3 is neither facially vague nor vague as applied to the defendant in that case. Justice O'Hern's dissent found the issue of the jury charge that must accompany a drug-kingpin prosecution inseparable from the issue of the validity of the statute as applied. The dissent concluded that the statute as applied was too vague to guide the jury's deliberation and to ensure the proper fulfillment of the jury's function. The dissent found compelling the decision of the Appellate Division in the present case, as well as its interpretation of the statute and

proposed jury instruction conforming to that interpretation. Because an instruction of the sort spelled out by the Appellate Division had not been given to the jury in this case, that court concluded that the jury, although it had convicted defendant, "did not determine whether defendant's status and activities warranted the punishment [that] the Legislature has reserved for a 'leader of a narcotics trafficking network.'" *Id.* 264 *N.J.Super.* at 111, 624 *A.*2d 48. We agree.

The State argues that in a prosecution for violating *N.J.S.A.* 2C:35–3, to include as part of the basic definition and as a specific element of the crime in the jury instructions any reference to the role of the defendant as an "upper echelon member" in the overall drug-distribution network improperly redefines the statutory crime. It reasons that the inclusion of that element is at odds with the elements of the offense that are set forth in *N.J.S.A.* 2C:35–3. Thus, the State contends that the Appellate Division's proposed instruction rewrites the drug-kingpin statute by requiring the State to prove beyond a reasonable doubt a material element that the Legislature did not include in its definition of the offense.

■ *N.J.S.A.* 2C:35–3 does not include some of the important factors used in the statutory statement of purpose to describe the drug-kingpin crime, and, to that extent, does not completely convey the full legislative understanding in creating this crime. The statement of purpose expressly makes the defendant's "upper-level" role in a drug network central to the activity criminalized by the Legislature. The prominence of the upper-level status of the defendant in the description and explanation of the purpose of the crime clearly evidences the Legislature's intent that the status or the position of the defendant in the drug trafficking network is a substantive part of the crime. Consistent with that intent, the status or position of the defendant should be considered a material element of the crime. Accordingly, we conclude that a trial court, in a prosecution pursuant to *N.J.S.A.* 2C:35–3, should instruct the jury that it must find that the defendant occupies a

high-level position, that is, a position of superior authority or control over other persons, in a scheme or organization of drug distribution (or manufacture or dispensing or transporting), and that in that position the defendant exercised supervisory power or control over others engaged in an organized drug-trafficking network.

That conclusion is based largely on the fact that the words of the statute alone under *N.J.S.A.* 2C:35-3, whether their meaning is "plain" or "clear" for constitutional purposes, without any further explanation would not fully convey to the jury the nature of the actual elements of the conduct that the Legislature intended to criminalize. Those elements, in addition to the activities enumerated in *N.J.S.A.* 2C:35-3, such as supervision, management, financing, and the like, include the role of the defendant as an "upper-level member" of a drug operation.

The recognition of the upper-level position of the defendant as an essential element of the crime under the drug-kingpin statute does not, as the State believes, entail a rewriting of the statute.

■ This Court has made abundantly clear that correct jury instructions are at the heart of the proper execution of the jury function in a criminal trial: " '[a]ppropriate and proper charges to a jury are essential for a fair trial.' " *State v. Collier*, 90 *N.J.* 117, 122, 447 *A.2d* 168 (1982) (alteration in original) (quoting *State v. Green*, 86 *N.J.* 281, 287, 430 *A.2d* 914 (1981)). A court's obligation properly to instruct and to guide a jury includes the duty to clarify statutory language that prescribes the elements of a crime when clarification is essential to ensure that the jury will fully understand and actually find those elements in determining the defendant's guilt.

For the purpose of instructing and guiding juries, courts regularly explain and define statutory language consistent with legislative intent. Courts commonly clarify statutory language to give more precise meaning to statutory terms to effect the legislative intent and to make sure that juries carry out that intent in

determining criminal culpability. For example, in *State v. Butler*, 27 *N.J.* 560, 593–94, 143 *A.*2d 530 (1958), the trial court instructed the jury in a felony-murder case on the elements of felony murder, but failed to define "robbery," a term used in the felony murder statute, *N.J.S.A.* 2A:113–1. We found that the right to such a definitional instruction was "absolute." *Id.* at 596, 143 *A.*2d 530. As we noted in *Butler*, "The classical practice generally followed in criminal cases is for the judge to outline the applicable law, *explaining* and *defining* the offense charged...." *Id.* at 594, 143 *A.*2d 530 (emphasis added). "The criminal law cannot be administered justly or efficiently if the jury is allowed to speculate as to what conduct the law intended to proscribe by a specified crime." *Id.* at 595, 143 *A.*2d 530.

Courts follow that approach even when statutory terms have common or well-understood meanings based on ordinary experience. In a prosecution under *N.J.S.A.* 2C:35–5 for possession of a controlled dangerous substance (C.D.S.) with the intent to distribute, for example, the model jury instruction includes a long definition of a relatively common term—"possession." *Model Jury Charges (Criminal),* § 2C:2–1 Possession (Oct. 17, 1988). That definition of possession does not appear anywhere in *N.J.S.A.* 2C:35–5. Rather, the definition reflects this Court's numerous expositions of the meaning of "possession." The model jury instruction's definition of "possession" includes the situation in which a person "is aware of the presence of the [C.D.S.] and is able to exercise intentional control or dominion over it." *Ibid.* The language of "intentional control or dominion" comes not from the literal language of *N.J.S.A.* 2C:35–5 but from this Court's interpretation of that statute. *See State v. Davis*, 68 *N.J.* 69, 82, 342 *A.*2d 841 (1975) ("Possession signifies intentional control and dominion...."). In *State v. Brown*, 80 *N.J.* 587, 600, 404 *A.*2d 1111 (1979), we upheld a challenge to a trial court's instruction because it was "clear from a reading of the trial court's instructions in their entirety that all of the essential elements of the crime of possession were *explained* to the jury." (Emphasis added.) A mere recitation of the statute would have been inade-

quate. *See also Town Tobacconist v. Kimmelman*, 94 *N.J.* 85, 104, 462 *A.*2d 573 (1983) (redefining statutory term, "drug paraphernalia" in Drug Paraphernalia Act because it would otherwise confuse jury).

■ Further, statutes containing words whose meanings are ordinary and understandable often require a judicial determination with respect to their intended scope of application. *State v. Thomas*, 132 *N.J.* 247, 254, 624 *A.*2d 975 (1993) (defining use of school property for school purposes as "essential element" of school-zone drug offense); *State v. Ivory*, 124 *N.J.* 582, 587–92, 592 *A.*2d 205 (1991) (defining property that constitutes "school property used for school purposes" for purposes of school-zone drug offense); *see also State ex rel. M.T.S.*, 129 *N.J.* 422, 609 *A.*2d 1266 (1992) (finding that legislative history was relevant to understanding of legislative intent that principles of criminal assault were relevant in defining element of force and role of consent for crime of second-degree sexual assault).

■ Moreover, when a criminal statute is somewhat ambiguous regarding the scope of its application, the ambiguity cannot inure to the benefit of the State. In *State v. Sein*, 124 *N.J.* 209, 590 *A.*2d 665 (1991), we determined whether the "snatching" of a purse constituted the use of "force upon another" required for a conviction under the robbery statute *N.J.S.A.* 2C:15–1a(1). We relied on our understanding of the legislative intent to strike down the purse-snatching conviction under the statute. *Id.* at 217–18, 590 *A.*2d 665.

In *State v. Sewell*, 127 *N.J.* 133, 603 *A.*2d 21 (1992), another case involving the interpretation of the robbery statute, we looked at a separate statutory provision (*N.J.S.A.* 2C:2–2c(3), known as the "gap-filling provision") to ascertain the requisite mental state intended by the Legislature for the crime of second-degree robbery. In so doing, we struck down a jury charge that did not "fully explain the essential elements of robbery." *Id.* at 150, 603 *A.*2d 21. The charge as rejected, like the charge employed by the trial court here, was faithful to the language of the relevant

statute. However, the faithfulness to the literal language of the statute did not convey the clear intent of the Legislature as expressed elsewhere in the statutory framework. Here, as in *Sewell*, the Legislature has expressly provided a fuller explication of its otherwise skimpy articulation of the conduct it intended to criminalize. The proper path is simply to embrace the clearly-expressed intent of the Legislature. In this case, a fuller definition of the statutory terms that is consistent with the legislative intent can readily be achieved because the Legislature has itself expressed the relevant terms more fully in *N.J.S.A.* 2C:35–1.1. We need not guess about what the Legislature intended.

■ An instruction that makes explicit the implicit elements of the crime does not involve rewriting the statute or redefining, modifying, amending, or adding to the substantive elements prescribed by the statute because that instructional definition conforms to the legislative intent and carries out that intent. Thus, a proper instruction should, in addition to reciting the statutory language of *N.J.S.A.* 2C:35–3, at least inform the jury that it must find that the defendant occupies a high-level position of authority in the scheme of distribution (or manufacture or dispensing or transporting, as the evidence may permit). A court should instruct the jury that a defendant's position and status must be at a superior or high level in relation to other persons in the drug trafficking network and that the defendant's role must be that of a "leader" in the drug organization or system and, in that capacity, the defendant exercised supervisory power or control over others engaged in the organized drug-trafficking network.

■ The Appellate Division also would define the term "high-level" or "upper-echelon," as follows: "An 'upper' level is a level [that] is superior to street-level distributors and to their immediate supervisors or suppliers." 264 *N.J.Super.* at 111, 624 *A.*2d 48. The dissent in *Afanador* concluded that that aspect of the Appellate Division's formulation of the substantive elements of the crime was not correct. See 134 *N.J.* at 185, 631 *A.*2d 946 (O'Hern, J., dissenting). We now also disapprove that proposed instruction.

Under the statute a drug-trafficking network need not have any specific configuration or chain of command. Such a network is not to be understood primarily or exclusively as a vertical, in contrast to a horizontal, organization. Rather, it is to be considered as an organization of persons who are collectively engaged in drug activities. A "high-level" or "upper-echelon" "leader" of such an organization is one who occupies a significant or important position in the organization and exercises substantial authority and control over its operations. Neither the specific elements enumerated in the provisions of *N.J.S.A.* 2C:35-3 nor the additional requirements extrapolated from the statute's statement of purpose indicate that a drug operator exercising authority and controlling other people in an organization or network, even at the street level, could not be a "leader" or "drug kingpin" within the contemplation of the Legislature. Rather, the role of a defendant as a leader or drug kingpin turns more on the nature of that person's authority, the magnitude or extent of control, and the number of persons over whom that power is exercised.

An appropriate instruction should also amplify the other statutory terms that are expressed as material elements of the crime under *N.J.S.A.* 2C:35-3. Thus, the statutory terms "organizer, supervisor, financier or manager" should be explained so that the meaning of those terms is more fully understood by the jury. For example, the court might define an "organizer" as a person who arranges, devises, or plans a drug-trafficking network; a "supervisor" as one who oversees the operation of a drug-trafficking network; a "financier" as one who is responsible for providing the funds or resources necessary to operate a drug-trafficking network; and a "manager" as one who directs the operations of a drug-trafficking network.

### III

We affirm so much of the judgment of the Appellate Division as reverses defendant's conviction and remands for a new trial. We

modify the terms of the remand with respect to the proper jury charge.

CLIFFORD, J., dissenting.

This Court does not have to love a statute, but we do have to apply it unless it is invalid. I fear that the majority's hostility to the enactment that the Legislature has given us has caused the Court to rewrite the "drug kingpin" statute—an illicit exercise bad enough in itself, made worse by the Court's botching of a job for which it is demonstrably ill-suited.

I would apply the statute as written and would reinstate the conviction of this $1500–to–$9000–per–week drug entrepreneur as a "leader of a drug trafficking network."

## I

Earlier this term a unanimous Court upheld the "drug kingpin" statute, *N.J.S.A.* 2C:35–3 (section 35–3), against a charge of facial vagueness. See *State v. Afanador,* 134 *N.J.* 162, 175, 631 *A.*2d 946 (1993). Afanador's attack on the statute centered on its "requirement that a defendant conspire as 'organizer, supervisor, financier or manager' of [a] drug-trafficking network." *Id.* at 171, 631 *A.*2d 946 (quoting section 35–3). In rejecting that attack we agreed with courts elsewhere that "a person of average intelligence comprehends the meaning" of those words. *Ibid.* We were all satisfied then—and I remain so now—that section 35–3 "describes the elements of the offense in common, well-understood terms * * * used by ordinary citizens in everyday conversation." *Id.* at 175, 631 *A.*2d 946. That feature distinguishes this case from the authorities on which the Court relies, *ante* at 571–574, 643 *A.*2d at 1000–1001, all of which involve legal terms of art and their definitions.

Plain as the statutory language was a few short months ago, according to the majority today it does not quite do the job. We are told that "without any further explanation" the words of section 35–3 alone "would not fully convey to the jury the nature

of the actual elements of the conduct that the Legislature intended to criminalize." *Ante* at 571, 643 *A*.2d at 1000. And so, relying on a separate statutory section, *N.J.S.A.* 2C:35–1.1 (section 35–1.1), the court has added to section 35–3's list of criminal elements yet another "essential element of the crime under the drug-kingpin statute," *ante* at 571, 643 *A*.2d at 1000, characterized variously as a defendant's "high-level position" in the nefarious scheme, *ante* at 571, 643 *A*.2d at 1000, or a defendant's "role * * * as an 'upper-level member' of a drug operation," *ante* at 571, 643 *A*.2d at 1000.

Reliance on section 35–1.1 as justification for the court's stunning addition of a defendant's "upper-level position" as "an *essential element* of the crime under the drug-kingpin statute," *ante* at 571, 643 *A*.2d at 1000 (emphasis added), is badly misplaced. Section 35–1.1c, quoted in essential part in the majority opinion, *ante* at 569, 643 *A*.2d at 999, does nothing more than set forth the Legislature's findings and its declaration of public policy. Section 35–1.1c does not criminalize any conduct, define any elements of any offense, provide for any penalties, or otherwise display any of the identifying features of a criminal statute. Those functions are left to *N.J.S.A.* 2C:35–2 to –16, in which the Legislature got down to the business of defining and grading the related criminal offenses. Section 35–1, which precedes those sections, is only what it purports to be, nothing more: a statement, an announcement of the Legislature's intent in creating certain crimes and prescribing the penalties therefor, an identification of the targets at which the Comprehensive Drug Reform Act of 1986, *L.* 1987, *c.* 106, is aimed.

Facing the dilemma created when the Legislature writes a statute whose operative provisions are crystal clear but whose operative provisions may not conform with the Legislature's explicit statement of legislative purpose, the Court attempts to remedy the situation by rewriting the operative provisions. We will never know why the Legislature, having so clearly indicated its intention that the statute should apply only to high-level drug

dealers, went on to define the crime in a way that would permit conviction of drug dealers at a lower level. What we do know, however, is that one part of the statute is a declaration of legislative intent and purpose, not a definition of a crime, and that another section of the statute is unmistakably the definition of the crime. The crime defined is "leader of narcotics trafficking network." The Legislature says so: "leader of narcotics trafficking network is a crime of the first degree and upon conviction thereof * * * a person shall be sentenced to an ordinary term of life imprisonment during which the person must serve 25 years before being eligible for parole." That is the crime. The Legislature also left no doubt about the elements of that crime:

> A person is a leader of a narcotics trafficking network if he conspires with others as an organizer, supervisor, financier or manager, to engage for profit in a scheme or course of conduct to unlawfully manufacture, distribute, dispense, bring into or transport in this State methamphetamine, lysergic acid diethylamide, phencyclidine or any controlled dangerous substance classified in Schedule I or II, or any controlled substance analog thereof.

One need not twist and turn to figure out what the Legislature meant by "leader of a narcotics trafficking network." It is there in black and white. The crime is named by the Legislature "leader of a narcotics trafficking network," and the crime is defined by the Legislature. As much as section 35–3 may not conform to section 35–1.1c's statement of legislative purpose and intent, that circumstance is for the Legislature, not for this Court, to remedy; for when this Court attempts to remedy it, as no case better shows than this, the Court drafts a new statute. Whether that new statute comes closer to the legislative intent or wanders farther from it is immaterial. The important point is that the Court's gratuitous and painfully inept amendment now becomes the law—not of the people of New Jersey, not of the Legislature, but of this Court.

But, says the Court, a jury is left in the dark by a charge that simply instructs in the language of the criminal statute, as recommended by the Model Jury Charge, see *Model Jury Charges (Criminal)*, § 2C:35–3—Leader of Narcotics Trafficking Network (Oct. 17, 1988), and as dutifully delivered by the trial court in this

case. And so, to pierce the newly-developed fog of language that just nine months ago communicated the elements of "leader of a drug-trafficking network" in "common, well-understood terms," *Afanador, supra,* 134 *N.J.* at 175, 631 *A.*2d 946, the Court declares that in addition to reciting the statutory language of section 35-3, the trial court must "at least inform the jury that it must find that the defendant occupies a high-level position of authority in the scheme of distribution * * *." *Ante* at 574, 643 *A.*2d at 1001. Presumably as a definition of what it means by "a high-level position of authority," the Court, in the very next sentence, rules that a trial court should instruct the jury that a "defendant's role must be that of a 'leader' in the drug organization or system and, in that capacity, the defendant exercised supervisory power or control over others engaged in the organized drug-trafficking network," *ante* at 574, 643 *A.*2d at 1001 an almost verbatim repetition of the definition provided earlier, in the Court's explanation of why a defendant's "upper-level" role in a drug network is "a substantive part of the crime." *Ante* at 573, 643 *A.*2d at 1001.

Stop right there. Either the court has added a new element— high-level position of authority—to the criminal offense, or it has introduced a requirement for a "clarifying" jury instruction whose most conspicuous attribute is a limitless potential for jury confusion and for production of inconsistent verdicts on similar facts. Either result is assiduously to be avoided.

I tend to think that the majority rewrites the statute and redefines the elements of the offense by engrafting a declaration of legislative policy onto the operative or criminalizing section. Most of the discussion thus far seeks to support that conclusion. But assuming that the Court's endeavor is only to give more complete definition to the Legislature's terms, without adding any essential elements to the offense itself, that effort has, I suggest, produced more chaos than clarification. The majority unearths no novel concept, clarifies nothing, illuminates no shadowy corners of the "drug-kingpin" statute by declaring that in a prosecution

under that statute the State must demonstrate that the defendant occupies "a position of superior authority or control over other persons * * * and that in that position the defendant exercised supervisory power or control over others engaged in an organized drug-trafficking network." *Ante* at 574, 643 *A.*2d at 1001. As we made abundantly clear in *Afanador, supra,* that is precisely what the State proves when it shows that the defendant is a leader of a narcotics-trafficking network:

> The clear implication of *"organizer,"* particularly in a statute dealing with a "leader" of a drug-trafficking network, is that the term describes a person who *exercises some supervisory power over others.* That becomes even clearer when the expression appears in the same context as the words *"supervisor, financier or manager,"* for those words *also connote some degree of control over another person's actions.* The meaning ascribed to the words used in a statute may be indicated or controlled by the words with which it is associated. Here, the inclusion of the word "organizer" among other terms *denoting authority to direct the acts of another* obviously indicates that it carries a similar connotation, namely, the primary meaning of "organizer" in common usage.
>
>      \*       \*       \*       \*       \*       \*       \*       \*
>
> The casual purchaser will not ordinarily constitute one of the "others" with whom a defendant conspires, because in most cases *a street distributor does not direct or supervise a drug buyer.* Although a dealer may inform a buyer how to complete the transaction, *he or she has no authority over the buyer.* Therefore, to violate the kingpin statute a defendant must *direct the actions of at least two other persons* other than the person to whom the defendant sells the drugs. Because street-level dealers ordinarily lack any *supervisory power* over their suppliers or buyers, the statute does not transform every dealer into a kingpin.'
>
> If, however, a defendant sells a quantity of drugs to a person who intends to resell those drugs and *the defendant has some supervisory power* over the reseller, that reseller is one of the "others" with whom the defendant has conspired. *That result comports with the Legislature's expressed intention to target "upper-echelon" members of a drug-trafficking network,* because in that instance the defendant has conspired with the reseller as an organizer, supervisor, manager, or financier.
>
> [134 *N.J.* at 172, 173, 631 *A.*2d 946 (emphases added) (citation omitted).]

Although we held in *Afanador* that section 35–3's operative or criminalizing terms were readily understood as matters of common parlance, I would have no objection to a recommendation that henceforth in a "drug kingpin" prosecution trial courts would do well to spoon-feed the jury with a discussion, similar to that quoted above from *Afanador,* of the meanings of those terms.

But surely I would not hold that the absence of any such discussion constituted plain error.

What, then, are we to make of the Court's holding that the trial court here committed plain error in failing to instruct the jury that defendant occupied a "high-level" or "upper-echelon" position? Furnishing no definition of those terms other than by building on *Afanador*'s common-usage notions of "supervisory power" and "control," and in fact rejecting (correctly) the Appellate Division's definition, *ante* at 574, 643 *A.*2d at 1002, the Court leaves jurors at sea, with no judicial guidance on how they should determine whether the defendants in the cases before them are "high-level" or "upper-echelon" players in the drug-trafficking scheme. Those terms, unlike the language of section 35–3, are not terms of the street, not in common usage. Including them as elements of a criminal statute in which they nowhere appear represents judicial mucking about in an area in which we have neither authority nor competence.

I would reverse and remand to the Law Division for reinstatement of defendant's conviction for violation of the "drug kingpin" statute.

Chief Justice WILENTZ and Justice GARIBALDI join in this dissenting opinion.

*For modification and affirmance*—Justices HANDLER, POLLOCK, O'HERN and STEIN—4.

*For reversal and remandment*—Chief Justice WILENTZ, and Justices CLIFFORD and GARIBALDI—3.