**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5192-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

TIMMA KALIDINDI,

     Defendant-Appellant.

_____

> Submitted September 14, 2021 – Decided October 14, 2021
>
> Before Judges DeAlmeida and Smith.
>
> On appeal from the Superior Court of New Jersey, Law Division, Somerset County, Indictment No. 14-01-0065.
>
> Joseph E. Krakora, Public Defender, attorney for appellant (Darcy J. Baboulis-Gyscek, Designated Counsel, on the brief).
>
> Michael H. Robertson, Somerset County Prosecutor, attorney for respondent (Amanda Frankel, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

After a jury trial, defendant Timma Kalidindi appeals from a verdict convicting him of first-degree murder, N.J.S.A. 2C:11-3, and third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d). After merging the weapons conviction, the trial court sentenced defendant to a term of fifty-five years' incarceration on the murder conviction, with defendant parole ineligible for eighty-five percent of that term. On appeal, defendant argues that the trial court committed plain error in three separate aspects of its jury charge. We affirm for the reasons set forth below.

I.

In 2013, Janaki Dantuluru filed for divorce from her husband, defendant Timma Kalidindi. He soon moved out of the marital home in Bridgewater; Janaki continued to reside there with their sixteen-year-old daughter. On November 14, 2013, the couple's daughter arrived home around 7:00 p.m., after an afterschool program, and found defendant inside the home, which surprised and scared her because defendant was barred by a civil order in the matrimonial action from being in the home. Defendant marched his daughter upstairs to her room; out of concern, she texted her mother, telling her not to come home. Defendant discovered the warning text on his daughter's phone and took the phone from her. Around 8:00 p.m., she heard the garage door open, suggesting

2

Janaki was entering the garage. The daughter heard defendant run downstairs, followed by screams from her mother. She called 9-1-1, and police arrived to find Janaki on the garage floor, unresponsive and without a pulse. Paramedics briefly restored Janaki's pulse and transported her to the local hospital, however she never regained consciousness and was pronounced dead at 1:49 a.m. Police observed about three feet of knotted "twiny rope" was wrapped around Janaki's neck. Defendant was arrested.

After being Mirandized, defendant gave a statement to police. He told detectives that before November 14, the last time he spoke with or saw Janaki was about two months prior. He explained that he went to the family home the day in question to get his luggage and that he was able to enter the home through a door that was always unlocked for the dog. Defendant stated that he had breakfast at the hotel on the morning of November 14 and went to a storage facility to arrange a place for his possessions. He told detectives that he rented a red Ford Escape, which he parked near the family home "somewhere near the pond" because he did not want his wife or daughter to know that he was there. The car was later located approximately a half mile away from their home. Defendant stated that he bought a flower for Janaki, but he could not remember

3

whether it fell out on his way into the house. He also could not remember bringing the rope inside the house from the car.

Defendant's version of the events in the home leading to Janaki's death was consistent with his daughter's version. Defendant encountered her when she returned from school and he instructed her to tell her friend to leave "just in case there is a fight." Defendant also told her that she should stay in her room and "[c]lose the door and stay inside," even if she heard noises or fighting. He admitted to the detectives that he confiscated his daughter's phone when he saw the warning text to Janaki.

Defendant told detectives that he "just want[ed] to have a conversation [with Janaki,] that's all," but that she kicked him in the leg and screamed once she discovered him in the kitchen. He explained that while there was a struggle in the kitchen, he could not remember chairs being thrown. Defendant told detectives he "had to control the screaming" and did so by grabbing Janaki's throat with two hands, at which point he was kneeling towards the laundry room and Janaki was on the ground, facing up. He told detectives that he just wanted to talk, but that Janaki kept screaming. He could not remember how hard he was squeezing her neck because it was "too stressful [of a] situation," but he recognized that he "shouldn't [have been] doing that . . . ." He told detectives

4

while he was strangling Janaki, he was listening for his daughter to see if she was crying, but did not hear anything. While his hands were squeezing Janaki's neck, he told her that he just wanted to talk to her and in response, "[s]he wasn't doing anything actually. She wasn't doing anything except . . . holding onto my hand and doing the scratching kind of thing. . . . [on] my pants." Defendant stated that he did not remember using the rope but did recall an officer knocking on the door while he was still in the laundry room. At that point, Janaki "was quiet already." Defendant recalled surrendering himself to the officer, telling him that he "pull[ed] [her] into . . . the garage." Defendant told detectives that he did not actually know why he moved Janaki's body or if he was trying to hide her, but then stated he did it because the police were knocking on the door. Defendant did not know whether Janaki was still breathing, explaining to detectives, "I am not a doctor or something like that[,] I just don't know why I was doing that . . . because I love my wife . . . ." Defendant told the detectives that he understood that squeezing someone's neck could result in death. When asked if he understood "that by choking [his] wife [he] could have killed her," he told the detectives that he understood.

When questioned about whether he told his daughter only one parent would survive, defendant could not recall saying that, but did acknowledge he

5

was angry. He told detectives that he "badly want[ed] to talk" to his family because the divorce was to be finalized the following Monday and he was against it.

In the ensuing investigation, police searched the rental car and recovered a white trash bag on the floor on the passenger side, which contained a two-foot piece of nylon rope. In the back, police located a black bag with court orders inside, as well as numerous receipts, defendant's Indian and United States passports, the storage facility rental agreement, wooden stakes, and empty packaging for a knife. A search of the family home revealed another rope in the basement, matching the one found in the garage. The rope was in a plastic Home Depot bag along with a razor knife. Investigators found a rose outside the house near the backyard. Police also searched defendant's hotel room on November 15, 2013. They located notes on a desk in his room, one of which said: "It is Timma. I love you my dear wife" and had Janaki's name written on it as well. Officers located the rental car receipt inside a casino shopping bag. Also seized from the bag were numerous receipts from various establishments, tickets, a separate rental agreement, and a $10,000 electronic money transfer confirmation, all of which were dated between October 2013 and November 2013.

6

## II.

At trial, several witnesses testified, including psychiatric experts for the State and the defense. Each psychiatrist gave an expert opinion as to the defendant's state of mind on November 14, the day of the murder. Dr. Harold Gilman, a board-certified forensic psychiatrist, testified for the State. He diagnosed defendant with a personality disorder, with schizotypal narcissistic features. Dr. Gilman testified that his examination of the defendant did not reveal symptoms of psychosis before or after the crime. Finally, Dr. Gilman testified as to specific acts by defendant which caused the doctor to conclude that defendant acted with knowledge and purpose when he killed his wife. Dr. Gilman listed: defendant parking his rental car out of sight of his wife and daughter on November 16; his desire to avoid being seen by his neighbor as he approached the family home; his understanding that a restraining order which barred him from the home was in effect; his deliberate choice to enter his home through a pet door he knew would be open; his instruction to his daughter to send her friend away and to stay in her room even if she heard her parents arguing; his bringing a rope into the house along with a knife; and his recognition of wrongdoing as exemplified by his prompt surrender to police. Upon making these observations, Dr. Gilman concluded that defendant was not

A-5192-18

suffering from mental illness which would have impaired his ability to act purposefully or knowingly at the time of Janaki's murder.

Dr. Martin Weinapple, a board-certified forensic psychiatrist, testified for the defense. The doctor examined defendant and made several observations, including: defendant's paranoid thinking about what he believed were the causes of his marital difficulties; defendant's stress and confusion at the time of the murder; and the presence of several triggering events for defendant which led to a brief psychotic episode resulting in Janaki's death at defendant's hands.[1] Dr. Weinapple ultimately diagnosed defendant with a generalized psychosis, as well as severe obsessive-compulsive disorder, explaining that "people with very severe OCD can have moments where they go over the edge and become psychotic" because the obsession "blends into almost paranoid delusional thinking, the obsession, it gets so strong." Dr. Weinapple testified that, in his opinion, defendant had experienced a brief psychotic episode, caused by obsessive-compulsive disorder and generalized psychosis. Dr. Weinapple

---

[1] Dr. Weinapple gave examples of events in defendant's life which, in his opinion, represented events that could have contributed to triggering a psychotic episode on November 16, 2013. The examples included: defendant being kicked by his wife upon her arrival in the garage; his wife's screams during their struggle; the divorce; and his daughter's chronic illness.

A-5192-18

further testified that defendant did not have the ability to act knowingly and purposely at the time he killed his wife.

At the charge conference, the court reviewed the proposed charge for murder with counsel. Counsel and the court jointly settled on use of the standard model jury charge for murder, which included instructions for passion/provocation and aggravated and reckless manslaughter.[2] After hearing the evidence, closing arguments, and the trial court's instructions, the jury convicted defendant.

Defendant appeals, making the following arguments:

POINT I

THE JURY CHARGE WAS FUNDAMENTALLY FLAWED BECAUSE IT FAILED TO INCLUDE IN ITS EXPLANATION OF THE LAW ANY REFERENCE TO THOSE ASPECTS OF THE EVIDENCE AT TRIAL THAT SUPPORTED DEFENDANT'S CONTENTION THAT HE HAD A MENTAL DISEASE OR DEFECT THAT PREVENTED HIM FROM ACTING PURPOSEFULLY OR KNOWINGLY. COMPOUNDING ITS ERROR, THE TRIAL COURT UNFAIRLY EMPHASIZED IN ITS CHARGE FACTS AND EVIDENCE THAT SUPPORTED ONLY THE STATE'S CONTENTION THAT DEFENDANT DID ACT PURPOSELY AND KNOWINGLY.

_____

[2] See Model Jury Charges (Criminal), "Murder, Passion/Provocation and Aggravated/Reckless Manslaughter (N.J.S.A. 2C:11-3(a)(1) and (2); 2C:11-4a, b(1) and b(2))" (rev. June 8, 2015).

(Not Raised Below)

POINT II

THE TRIAL COURT'S CHARGE ON PASSION-PROVOCATION MANSLAUGHTER FAILED TO EXPLAIN TO THE JURY THAT WHETHER OR NOT DEFENDANT ACTUALLY WAS IMPASSIONED AND WHETHER OR NOT HE ACTUALLY COOLED OFF ARE SUBJECTIVE FACTORS THAT MUST BE VIEWED FROM THE PERSPECTIVE OF THE DEFENDANT, NOT FROM THE PERSPECTIVE OF AN ORDINARY PERSON (Not Raised Below)

Point III

THE TRIAL COURT INSTRUCTED THE JURY ON THE DEFENSE OF MENTAL DISEASE OR DEFECT, N.J.S.A. 2C: 4-2, PRELIMINARILY AND COMPLETELY SEPARATE AND OUT OF CONTEXT FROM ITS CHARGE ON PURPOSEFUL AND KNOWING MURDER AND PASSION-PROVOCATION MANSLAUGHTER. INEXPLICABLY, THE TRIAL COURT THEN SPECIFICALLY INCLUDED INSTRUCTIONS ON MENTAL DISEASE AND DEFECT IN ITS INSTRUCTION TO THE JURY ON THE OFFENSE OF POSSESSION OF A WEAPON FOR AN UNLAWFUL PURPOSE, LEADING THE JURY TO POSSIBLY INFER THAT THE DEFENSE ONLY APPLIED TO THE LATTER CRIME, BUT NOT TO MURDER OR PASSION PROVOCATION MANSLAUGHTER. THAT DEFECT, COMBINED WITH THE COURT'S FAILURE TO INCLUDE IN ITS CHARGE ANY REFERENCE TO THE EVIDENCE AT TRIAL THAT SUPPORTED DEFENDANT'S CLAIM OF MENTAL DISEASE OR

DEFECT CONSTITUTED PLAIN AND PREJUDICIAL ERROR AND REQUIRES REVERSAL OF DEFENDANT'S CONVICTION. (Not Raised Below)

## III.

When a defendant fails to object to a jury charge at trial, "there is a presumption that the charge was not error and was unlikely to prejudice the defendant's case." State v. Singleton, 211 N.J. 157, 182 (2012). In cases like this, the standard of review is plain error. State v. Nero, 195 N.J. 397, 407 (2008) (citing State v. Chapland, 187 N.J. 275, 288-89 (2006)). "[P]lain error requires demonstration of 'legal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result.'" Ibid. (quoting Chapland, 187 N.J. at 288-89). The alleged error is viewed in totality of the entire charge and the error is considered in light of the strength of the State's overall case. Ibid. (citing Chapland, 187 N.J. at 288-89).

An essential ingredient of a fair trial is that a jury receive adequate and understandable instructions. Correct instructions are "at the heart of the proper execution of the jury function in a criminal trial." State v. Afanador, 151 N.J.

11

41, 54 (1997) (quoting State v. Alexander, 136 N.J. 563, 571 (1994)). The instructions must be accurate and provide a "comprehensible explanation of the questions that the jury must determine, including the law of the case applicable to the facts that the jury may find." Singleton, 211 N.J. at 181-82 (2012) (quoting State v. Green, 86 N.J. 281, 287-88 (1981)). In assessing the propriety of a jury charge, an appellate court should examine the entire charge to see whether it was ambiguous or whether it misinformed the jury of the law. See State v. Torres, 183 N.J. 554, 564 (2007) (citations omitted).

Defendant argues first that the trial court's jury charge failed to include evidence that defendant lacked the mental capacity to commit murder, or one of the lesser included offenses. We disagree. The record shows the trial court gave thorough general instructions to the jury regarding its role in evaluating fact and opinion testimony adduced at trial. During the court's jury instruction regarding the offenses of murder, passion/provocation manslaughter, and possession of a weapon for an unlawful purpose, it specifically addressed the defendant's mental state at the time of the murder as follows:

> Evidence alleging that . . . [d]efendant suffered from a mental disease or defect, specifically psychosis not otherwise specified, and obsessive-compulsive disorder, OCD, have been provided through the testimony of Dr. Weinapple. In considering the State's burden of proof which is to prove every element of a

12

> charge presented beyond a reasonable doubt, you must consider and weigh all of the evidence as to the Defendant's mental state, including that offered as evidence of psychosis not otherwise specified, and obsessive-compulsive disorder, OCD, in determining whether or not the State has proven beyond a reasonable doubt that Timma Kalidindi acted purposely or knowingly, which are elements of the offenses of murder, passion-provocation manslaughter, and possession of a weapon for an unlawful purpose.

The trial court expressly incorporated the defense expert's medical diagnosis into the charge, providing the jury a clear roadmap from which they could make findings regarding the defendant's mental state. The jury evidently heard and rejected Dr. Weinapple's expert testimony. When we consider defendant's argument in the totality of the entire charge, we find no plain error. See Nero, 195 N.J. at 407.

Defendant's second argument regarding the trial court's passion/provocation charge has little merit. At defendant's request during the charge conference, the trial court instructed the jury in accordance with the model jury charges as to murder and passion/provocation. The passion/provocation charge specifically addresses the four elements that a jury must evaluate to find the defendant guilty of the lesser included offense of passion/provocation manslaughter. The four factors are:

(1) There was adequate provocation;

(2) The provocation actually impassioned defendant;

(3) Defendant did not have a reasonable time to cool off between the provocation and the act which caused death; and

(4) Defendant did not actually cool off before committing the act which caused death.

[State v. Mauricio, 117 N.J. 402, 412-13 (1990).]

The model charge language on passion/provocation is clear and unambiguous. Its plain language guides and directs the jury regarding its use of objective and subjective considerations in analyzing each of the four factors. The jury considered the entirety of the evidence and found the state met its burden in proving absence of at least one of the factors in rendering a verdict of murder. We presume juries will adhere to a trial court's instructions. State v. Loftin, 146 N.J. 295, 390 (1996). Where the trial court gave the murder, passion/provocation, aggravated/reckless manslaughter model jury charge at defendant's request, we find no plain error. See State v. R.B., 183 N.J. 308, 325 (2005).

Finally, defendant argues that the trial court erred by giving separate instructions on the mental disease or defect defense in different places in the jury instruction. Defendant argues this was confusing to the jury, and that it

could have caused them to conclude that the lack of mental capacity defense did not apply to all of the charged crimes. We reject this argument. Again, the trial court utilized the model jury charges, with appropriate "modifi[cations] to meet the facts adduced at trial . . . ." Ibid.[3] Not only did the defendant not object to this charge, but the record shows an extensive colloquy between counsel and the court on this topic during the charge conference. Defendant has failed to show plain error here. Any other arguments made by defendant lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[3] Model Jury Charges (Criminal), "Evidence of Mental Disease or Defect (N.J.S.A. 2C: 4-2)" (rev. June 5, 2006).