SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

## State v. Barry Berry (A-8-22) (086838)

**Argued February 28, 2023 -- Decided June 7, 2023**

**FASCIALE, J., writing for a unanimous Court.**

A jury found defendants Kenneth Daniels, Levell Burnett, and Barry Berry guilty of being leaders of a drug trafficking network, N.J.S.A. 2C:35-3, commonly referred to as the "kingpin" offense. As to the four material elements of the kingpin offense, the jury asked whether it was "possible" to be a supervisor (the third element), but not to occupy a high-level position (the fourth element). The Court considers whether the judge's response to that question was error capable of producing an unjust result. The Court also considers the Appellate Division's determinations that the trial judge should have modified element four of the model kingpin charge by adding language from State v. Alexander, 136 N.J. 563, 571 (1994), to further explain what constitutes a "high-level" member of a conspiracy and that the judge needed to tailor the kingpin charge to the evidential proofs admitted against each defendant, as well as its determination that Berry's motion for a judgment of acquittal should have been granted.

Regarding the kingpin charges against defendants, the trial court's instructions closely tracked the model charge. The court explained that "the State must prove each of the following elements beyond a reasonable doubt: One, that the defendant conspired with two or more persons. Two, that the purpose of the conspiracy included a scheme or course of conduct to unlawfully manufacture, distribute, dispense or transport heroin in the state. And, three, that the defendant was a financier or the defendant was an organizer, supervisor, or manager of at least one other person. And number four, that defendant occupied a high level position in the conspiracy." During deliberations, the jury submitted a question to the court: After pointing out that elements three and four seemed similar, they asked whether element three could be found without finding element four.

The judge announced that he would re-read the charge and then "explain it a little bit." The judge read the indictment and then re-read the instructions about the offense and its elements. After reading the third and fourth elements of the offense, the judge added: "All right, so you have the 4 elements, 3 and 4 on the surface do they sound similar? Yeah, I would agree with you. They sound similar but they are

1

4 separate elements to this offense and you have to consider each one separately. And you have to [decide] whether each element has been proven beyond a reasonable doubt or not. If you find that [all] of the 4 elements ha[ve] been proven beyond a reasonable doubt, then your verdict must be guilty on that charge."

At sidebar, Burnett's counsel requested that the judge directly answer the jury's question by instructing them that a defendant can be a supervisor without occupying a high level position. The judge responded that he would prefer to "just stick with the model charge, try to elaborate on that a little bit and let them decide." Following deliberations, the jury returned a guilty verdict for each of the defendants on the charge of being a leader of a narcotics trafficking network.

Defendants appealed from their convictions under N.J.S.A. 2C:35-3, in part challenging the trial court's instructions on the kingpin charge. 471 N.J. Super. 76, 89, 94-98 (App. Div. 2022). As to the kingpin charge, the Appellate Division opined that it should have included language from Alexander further defining what constituted a "high-level" member of the conspiracy. Id. at 105, 112-13. It also found that the judge should have tailored the kingpin charge to the proofs as to each defendant. Id. at 114. As to Berry, the appellate court found that the evidence against him was insufficient to sustain a kingpin conviction. Id. at 102, 104. The Court granted the State's cross-petition for certification. 252 N.J. 97 (2022).

**HELD:**     *Judges are encouraged, when practical, to respond "yes" or "no" to unambiguous and specific questions posed by juries during deliberations rather than solely re-read sections of the final jury charge. In general, when a specific request for clarification clearly calls for and is capable of a "yes" or "no" answer, like here, then judges should respond accordingly. Here, the answer to the jury's question is indisputably "yes," one can be a "supervisor" but not hold a "high-level" position in a drug trafficking network. Instead of responding "yes" to the question, however, the judge re-read the entire model kingpin charge; opined that those elements, three and four, sounded similar; and may have implicitly suggested that being a "supervisor" is sufficient to establish that a defendant held a "high-level" position within such an organization. The response to the question was an error clearly capable of producing an unjust result.

*Regarding the appellate determination that it was error not to alter portions of the model jury charge here, the trial court was under no obligation either to mold the charge sua sponte by factually addressing the varying levels of authority that each defendant played in the conspiracy or to modify the model charge by adding further definitional language from Alexander. The trial judge properly denied Berry's motion for a judgment of acquittal.

2

1. The Court reviews in detail the legislative history of the kingpin statute. After upholding the statute as constitutional in State v. Afanador, 134 N.J. 162, 165 (1993), the Court addressed the adequacy of a jury charge in a kingpin prosecution in Alexander, 136 N.J. 563. The Alexander Court concluded that, to be consistent with the Legislature's intent in enacting the kingpin statute, a trial court "should instruct the jury that it must find that the defendant occupies a high-level position, . . . and that in that position the defendant exercised supervisory power or control over others engaged in an organized drug-trafficking network." Id. at 570-71. The Court added that "[a]n appropriate instruction should also amplify the other statutory terms that are expressed as material elements of the crime under N.J.S.A. 2C:35-3." Id. at 575. The model jury charge for the kingpin statute and then N.J.S.A. 2C:35-3 itself were revised in keeping with Alexander. The history of the statutory amendment reveals that the Legislature considered including in the statute that a leader is "an upper echelon member" of a trafficking network and other additional language but declined to do so. Ultimately, by considering and declining to incorporate into the statute itself a number of Alexander's requirements, the Legislature left in place the judicial elaboration of the kingpin statute through case law and the model jury charge. Here, the jury charge thus tracked verbatim a model charge that was explicitly addressed both by the Court and by the Legislature. There was no plain error in the trial court's general kingpin instruction, which comports with the statute and interpretive case law. (pp. 15-23)

2. A trial judge is obliged to answer jury questions posed during the course of deliberations clearly and accurately and in a manner designed to clear its confusion. Here, the jury's question was not ambiguous. The jury wanted to know whether it was "possible" to find that the State proved element three but that it did not prove element four. The jury did not probe generally the kingpin instruction. And its reason for seeking clarification was also unambiguous: elements three and four sounded "a little" bit similar. Since the jury question was not ambiguous, the judge was obligated to "clear the confusion" about whether it was "possible" to find three but not four by responding directly with "yes" or "no" to the specific inquiry posed. The Court encourages judges, when the law is clear, to respond directly to unambiguous and specific "yes" or "no" questions from juries during deliberations, rather than simply re-read the final jury charge. Here, the answer should have been "yes." In declining to answer "yes," the judge informed counsel that he would re-read the entire charge then "elaborate on that a little bit." Although the judge was correct that each element of the offense must be considered separately, his statement that he "agree[d] with" the jury that elements three and four "sound[ed] similar" could easily have been interpreted to mean that the two require the same proofs, which is not correct. The judge's elaboration, therefore, amounted to plain error, and it was clearly capable of producing an unjust result because such a suggestion -- that being a supervisor (element three) is sufficient to establish that a defendant occupied a high-level position (element four) -- could have led the jury to find the

3

State proved defendants were "high-level" leaders merely by proving they were supervisors. If the jury had been told that it could find element three without finding element four, its verdict on the kingpin charges against defendants might have been not guilty. Defendants' convictions must therefore be vacated. (pp. 24-27)

3. Turning to the Appellate Division's conclusion that the trial court should have molded "the jury instructions to address the varying levels of authority of each individual defendant" in the drug trafficking network, 471 N.J. Super. at 110 n.5, the Court finds such tailoring was unwarranted. The Court finds no basis for adding further language from Alexander that a "high-level" or "upper-echelon" leader of an organization is someone "who occupies a significant or important position in the organization and exercises substantial authority and control over its operations." Id. at 110 (quoting Alexander, 136 N.J. at 575). And, in the circumstances of this case, tailoring the charge to each defendant was not necessary. First, the Alexander Court made it quite clear that under N.J.S.A. 2C:35-3, a drug trafficking network "need not have any specific configuration or chain of command." Alexander, 136 N.J. at 575. It was unnecessary for the judge to mold the charge to address respective levels of authority within a hierarchy among defendants in the criminal enterprise. Second, this was not a protracted trial with substantial conflicting testimony about leadership roles. There was no need to incorporate evidentiary facts into the kingpin charge. In addition, the parties may have disagreed over the choice of which facts to incorporate and whether the evidence of such facts was sufficient to be included in the court's charge. (pp. 27-29)

4. The Court disagrees with the appellate court's reversal of the order denying Berry's motion for acquittal. The Court reviews the evidence presented to support the State's theory regarding Berry, including the contents of wiretapped phone calls, and concludes that a reasonable jury could afford different weight to that evidence than the Appellate Division did. The justification to acquit Berry was far from clear, and the trial court properly denied his motion for acquittal. (pp. 29-32)

**AFFIRMED AS MODIFIED and REMANDED for a new trial as to all defendants on the kingpin charge.**

**CHIEF JUSTICE RABNER; JUSTICES PATTERSON, SOLOMON, PIERRE-LOUIS, and WAINER APTER; and JUDGE SABATINO (temporarily assigned) join in JUSTICE FASCIALE's opinion.**

4

# SUPREME COURT OF NEW JERSEY
## A-8 September Term 2022
## 086838

State of New Jersey,

Plaintiff-Appellant,

v.

Barry Berry,

Defendant-Respondent.

State of New Jersey,

Plaintiff-Appellant,

v.

Kenneth Daniels, a/k/a
Kendal Burnett,

Defendant-Respondent.

State of New Jersey,

Plaintiff-Appellant,

v.

Levell Burnett, a/k/a
Lavelle Burnett,

Defendant-Respondent.

1

On certification from the Superior Court,
Appellate Division, whose opinion is reported at
471 N.J. Super. 76 (App. Div. 2022).

| Argued | Decided |
| --- | --- |
| February 28, 2023 | June 7, 2023 |

Stephen A. Pogany, Special Deputy Attorney
General/Acting Assistant Prosecutor, argued the cause for
appellant State of New Jersey (Theodore N. Stephens, II,
Acting Essex County Prosecutor, attorney; Stephen A.
Pogany, and Caroline C. Galda, Special Deputy Attorney
General/Acting Assistant Prosecutor, of counsel and on
the briefs).

Tamar Y. Lerer, Assistant Deputy Public Defender,
argued the cause for respondent Levell Burnett (Joseph E.
Krakora, Public Defender, attorney; Marcia Blum,
Assistant Deputy Public Defender, of counsel and on the
briefs, and Tamar Y. Lerer, on the briefs).

Stephen W. Kirsch, Designated Counsel, argued the
cause for respondent Kenneth Daniels (Joseph E.
Krakora, Public Defender, attorney; Stephen W. Kirsch,
on the brief, and Kenneth Daniels, pro se, on the
supplemental brief).

David A. Gies, Designated Counsel, argued the cause for
respondent Barry Berry (Joseph E. Krakora, Public
Defender, attorney; David A. Gies, on the briefs).

Marc Yenicag argued the cause for amicus curiae
Association of Criminal Defense Lawyers of New Jersey
(Pashman Stein Walder Hayden, attorneys; CJ Griffin, of
counsel, and Zachary Levy, on the brief).

JUSTICE FASCIALE delivered the opinion of the Court.

In this appeal, we focus primarily on the trial judge's response to a question posed by the jury during deliberations. A jury found defendants Kenneth Daniels, Levell Burnett, and Barry Berry guilty of being leaders of a drug trafficking network, N.J.S.A. 2C:35-3, commonly referred to as the "kingpin" offense. As to the four material elements of the kingpin offense, the jury asked whether it was "possible" to be a supervisor (the third element), but not to occupy a high-level position (the fourth element). That question required a "yes" or "no" answer -- and the answer is indisputably "yes," one can be a "supervisor" but not hold a "high-level" position in a drug trafficking network. Instead of responding "yes" to the question, however, the judge re-read the entire model kingpin charge; opined that those elements, three and four, sounded similar; and may have implicitly suggested that being a "supervisor" is sufficient to establish that a defendant held a "high-level" position within such an organization. The response to the question was an error clearly capable of producing an unjust result.

We hold that judges are encouraged, when practical, to respond "yes" or "no" to unambiguous and specific questions posed by juries during deliberations rather than solely re-read sections of the final jury charge. In general, when a specific request for clarification clearly calls for and is

3

capable of a "yes" or "no" answer, like here, then judges should respond accordingly.

Without concluding he should have answered "yes," the Appellate Division determined that the trial judge failed to adequately address the "fundamental import of the jury's question." State v. Berry, 471 N.J. Super. 76, 112 (App. Div. 2022). It found that the trial judge should have modified element four of the model kingpin charge by adding language from State v. Alexander, 136 N.J. 563, 571 (1994), to further explain what constitutes a "high-level" member of a conspiracy. And it determined that the judge needed to tailor the kingpin charge to the evidential proofs admitted against each defendant. The Appellate Division therefore reversed the kingpin convictions as to defendants Kenneth Daniels and Levell Burnett. As to defendant Barry Berry, however, the appellate court reversed an order denying his motion for a judgment of acquittal and vacated his conviction.

Regarding the appellate determination that it was error not to alter portions of the model jury charge here, we hold that the trial court was under no obligation either to mold the charge sua sponte by factually addressing the varying levels of authority that each defendant played in the conspiracy or to modify the model charge by adding further definitional language from

4

Alexander.  And we conclude that the trial judge properly denied Berry's

motion for a judgment of acquittal.

We therefore affirm as modified the Appellate Division's judgment to

vacate the kingpin convictions as to Daniels and Burnett; and we reverse the

appellate court's reversal of the trial judge's denial of Berry's motion for a

judgment of acquittal.  We remand for a new trial against all defendants on the

State's kingpin charge.

I.

The police arrested Daniels for car theft and incarcerated him for six

weeks.  During that time, prosecutors recorded wiretapped jailhouse calls

between Daniels and his co-defendants about narcotics distribution.  As

relevant here, the State intercepted twenty-four telephone conversations:

fifteen of the calls were from Daniels to Berry or Burnett; two were from

Daniels to others; two were from Burnett to Daniels; and five were from Berry

to others.

Communication data warrants led to the arrests of Burnett and Berry.

Unlike many other kingpin cases, this case did not involve testimony from a

cooperating witness describing the organizational hierarchy of the criminal

enterprise.  As supplemented by physical evidence gathered by investigators,

including money, narcotics, and weapons, the wiretapped conversations

constituted the bulk of the State's evidence against defendants. Berry, Burnett, and Daniels were all indicted for multiple offenses, see Berry, 471 N.J. Super. at 93-97, including first-degree being a leader of a narcotics trafficking network in violation of N.J.S.A. 2C:35-3.

## A.

Prior to trial, counsel for Burnett moved to dismiss the counts of the indictment relating to the kingpin charge or, in the alternative, to edit the model jury charge, including by adding that "[a]nother material element of the crime is the . . . existence of a drug trafficking scheme, network or system." (citing State v. Ellis, 424 N.J. Super. 267 (App. Div. 2012)). Counsel asked the judge to explain to the jury that, "[w]hile no particular form of organization is required, there must be some form of structured relationship."

The court declined to dismiss the kingpin counts. The trial court also rejected the challenge to using the model jury charge as is, noting that the model charge was modified after changes to the statute and this Court's opinion in Alexander, and that, in State v. Feliciano, 224 N.J. 351 (2016), this Court "saw no reason to disturb the model jury charge or the amended statute with the added language" proposed in that case.

At trial, the State played for the jury the recorded twenty-four conversations described above, and introduced testimony from an expert who

6

interpreted the meaning of slang words and phrases utilized in the calls. The State also introduced into evidence weapons, money, and drugs that further implicated defendants.

After the State rested, defendants moved for judgments of acquittal pursuant to Rule 3:18-1 and State v. Reyes, 50 N.J. 454 (1967), arguing that the phone calls and physical evidence produced by the State were insufficient to establish that they were leaders of a drug trafficking organization.

The trial court observed that

> [d]uring the calls, there are discussions that can be inferred to be regarding a drug trafficking network, such as collecting money from certain individuals; packaging and distribution of drugs; the mention of various individuals who appear to be under the authority of the defendants in the organization; orders being given out; discussion about firearms; supervision of lower level individuals and so forth.

"[V]iewing the State's evidence in its entirety . . . and giving the State the benefit of all its favorable testimony, as well as all of the favorable inference[s] which reasonably could be drawn therefrom," the trial court determined that "a reasonable jury could find guilt of the charge beyond a reasonable doubt" and therefore denied the motions.

B.

After both the State and defendants closed their cases, the trial court instructed the jury on its role. Regarding the kingpin charges, the trial court's

7

instructions closely tracked the model charge. See Model Jury Charges (Criminal), "Leader of Narcotics Trafficking Network (N.J.S.A. 2C:35-3)" (rev. Oct. 23, 2000). The court first read the offense as set forth in N.J.S.A. 2C:35-3 and reprinted in the model charge, that "[a] person is a leader of a narcotics trafficking network if he conspires with two or more other persons in a scheme or course of conduct to unlawfully manufacture, distribute, dispense, or transport in this State" one or more of a list of specified controlled dangerous substances "as a financier, or as an organizer, supervisor or manager of at least one other person."

The court then told the jury that,

> [i]n order to convict a defendant of this charge, the State must prove each of the following elements beyond a reasonable doubt: One, that the defendant conspired with two or more persons. Two, that the purpose of the conspiracy included a scheme or course of conduct to unlawfully manufacture, distribute, dispense or transport heroin in the state. And, three, that the defendant was a financier or the defendant was an organizer, supervisor, or manager of at least one other person. And number four, that defendant occupied a high level position in the conspiracy.

Again, the court's list of elements tracked the model jury charge verbatim, as did the court's more detailed explanations of the elements particularly relevant here:

> The third element that the State must prove beyond a reasonable doubt for this charge, is that the defendant

8

acted as a financier or as an organizer, supervisor, manager of at least one other person. A financier is a person who, with the intent to derive a profit, provides money or credit or other thing of value in order to purchase a controlled dangerous substance or an immediate precursor or otherwise to finance the operations of a drug trafficking network. The State need not prove that any intended profit was actually realized.

An organizer is a person who purposely arranges, devises or plans a drug trafficking conspiracy. A supervisor is one who purposely oversees the operation of a drug trafficking conspiracy. A manager is one who purposely directs the operation of a drug trafficking conspiracy.

. . . .

The fourth element that [the] State must prove beyond a reasonable doubt on this charge is that the defendant held a high level position in the drug trafficking conspiracy. In other words, the State must prove that the defendant occupied a position of superior authority or control over other persons in a scheme or organization of drug distribution or manufacture, dispensing or transportation, and that in that position the defendant exercised supervisory power or control over others engaged in the drug trafficking conspiracy.

Defendant, however, does not have to be the only, or even the primary financier, organizer, supervisor or manager, and it is no defense that defendant was subject to the supervision or management of another, nor that another person or persons were also leaders of the narcotics trafficking network.

9

C.

During deliberations, the jury submitted a question to the court. The jurors did not probe generally into the kingpin instruction. They did not ask that the judge re-read any part of the charge. Instead, their question was precise. After pointing out that elements three and four seemed similar, they asked whether element three could be found without finding element four. The judge read the question at sidebar with counsel:

> With regards to the leader of narcotics trafficking network; in defining [the] high level element, number 4 . . . , the wording seems similar <u>a little</u> to element 3. Clarifying question: <u>Is it possible to be a supervisor, element 3, but not high level for element 4</u>?
>
> [(emphases added) (quotation marks omitted).]

He then discussed with counsel how to respond.[1]

The judge expressed his initial intention to re-read all elements of the kingpin offense -- not just three and four -- and asked for trial counsel's input. The assistant prosecutor and Daniels' counsel agreed that the judge should re-read the entire kingpin charge. Burnett's counsel, joined by Berry's counsel, renewed her pretrial motion essentially requesting that elements three and four be more fully defined.

---

[1] The lawyers for both parties in this appeal, who did not try the case, agree that the answer to the question is "yes."

The judge brought the jury back and announced that he would re-read the charge and then "explain it a little bit." The judge read the indictment charging each defendant with "being a leader of a narcotics trafficking network," and noted that the language of the statute was "very similar" to that of the indictment. The judge then re-read the instructions about the offense and its elements. After reading the third and fourth elements of the offense, the judge added:

> All right, so you have the 4 elements, 3 and 4 on the surface do they sound similar? Yeah, I would agree with you. They sound similar but they are 4 separate elements to this offense and you have to consider each one separately. And you have to [decide] whether each element has been proven beyond a reasonable doubt or not. If you find that [all] of the 4 elements ha[ve] been proven beyond a reasonable doubt, then your verdict must be guilty on that charge. If you find that . . . any one of the four elements for this charge has not been proven beyond a reasonable doubt then your verdict has to be not guilty on this charge.

At sidebar, Burnett's counsel requested that the judge directly answer the jury's question by instructing them that a defendant can be a supervisor without occupying a high level position, explaining her view that, if the jurors "ask for a yes or no answer, . . . it's . . . legally correct to say yes, it's possible to be guilty on 3 but not 4." Then she explained, "I think that's what they are looking for. I think that's simple and straightforward and it's true and . . . would be helpful for them." The judge responded, "[l]et's stick to what I just

11

gave them. If they come back with more, I will try to [do] a little more but," he elaborated, "I don't like going down a road of giving an exact answer. I'd rather just stick with the model charge, try to elaborate on that a little bit and let them decide. We'll see how it is."

The jurors did not pose further questions about that instruction. Following deliberations, the jury returned a guilty verdict for each of the defendants on the charge of being a leader of a narcotics trafficking network.

D.

Defendants appealed from their convictions under N.J.S.A. 2C:35-3, in part challenging the trial court's instructions on the kingpin charge. Berry, 471 N.J. Super. at 89, 94-98.

As to the charge, the Appellate Division opined that reading verbatim the model kingpin charge is ordinarily sufficient. Id. at 104. But the court determined that here, where the State alleged three defendants were leaders, the kingpin charge should have included language from Alexander further defining what constituted a "high-level" member of the conspiracy. Id. at 105, 112-13. It also found that the judge should have tailored the kingpin charge to the proofs as to each defendant. Id. at 114. As to Berry, the appellate court found that the evidence against him was insufficient to sustain a kingpin conviction. Id. at 102, 104.

12

We denied petitions for certification by the defendants, 252 N.J. 80 (2022); 252 N.J. 87 (2022); 252 N.J. 96 (2022), but granted the State's cross-petition for certification, 252 N.J. 97 (2022). We also granted the motion of the Association of Criminal Defense Lawyers of New Jersey (ACDL) to appear as amicus curiae.

## II.

The State argues that the trial judge responded appropriately to the jury's "yes" or "no" question, although it now concedes that the answer to the question is "yes" because it is in fact "possible" to be a "supervisor" (element three) but not hold a "high-level" position (element four) in the conspiracy. The State contends, however, that the current model kingpin charge, which has existed for more than two decades, is adequate as it is, even in multi-defendant cases, like this one, where there are multiple alleged leaders of a criminal enterprise. It maintains that the Appellate Division erred by requiring the judge to include in the kingpin charge more language from Alexander about what constitutes a "high-level" position and by determining that the trial judge should have molded the kingpin charge to the evidence against each defendant. Finally, the State asserts the Appellate Division disregarded its proofs in reviewing Berry's Reyes motion.

13

Defendants contend the judge failed to answer the jury's question by not simply saying "yes," and exacerbated the problem by giving his opinion that elements three and four of the kingpin offense sounded similar. Defendants argue generally that the judge was obligated to analyze the reason for the jury's question and that a further definition of "high-level" would have been appropriate, especially in a multi-defendant case like this where each defendant is charged with being a leader and where there is no testimony explaining the inner workings of the criminal enterprise. Berry additionally argues that the appellate court correctly applied <u>Reyes</u> to acquit him.

The ACDL asserts that the model kingpin charge is fundamentally flawed. It contends that the fourth element of the existing charge provides a confusing definition of what it means to hold a "high-level" position in the drug trafficking conspiracy. For that reason, it urges us to refer the matter to the Committee on Model Criminal Jury Charges to study the issue and adopt clarifying language from <u>Alexander</u> that the model charge currently does not contain.

## III.

The trial judge's response to the jury's question seeking clarification requires us to briefly address the kingpin statute; determine whether the longstanding kingpin model jury charge adequately instructs jurors on the law;

14

determine whether, in elaborating on that charge in response to the jury's request for clarification, the trial court misstated the law; and, finally, determine whether the judge should have molded the charge to the facts by explaining defendants' respective levels of authority in the drug trafficking network. We begin with the adequacy of the model jury charge.

A.

The kingpin statute, N.J.S.A. 2C:35-3, was enacted as part of the Comprehensive Drug Reform Act of 1987, L. 1987, c. 106. The Act contains several "[d]eclaration[s] of policy and legislative findings," including that,

> [i]n order to be effective, the battle against drug abuse and drug-related crime must be waged aggressively at every level along the drug distribution chain, but in particular, our criminal laws must target for expedited prosecution and enhanced punishment those repeat drug offenders and upper echelon members of organized narcotics trafficking networks who pose the greatest danger to society.
>
> [N.J.S.A. 2C:35-1.1(c) (emphases added).]

The legislative history of the Act notes how its overarching policies are furthered by N.J.S.A. 2C:35-3, which

> is designed to reach the upper echelon participants in an illegal narcotics conspiracy. This provision makes it a crime to conspire with others as an organizer, supervisor, financier or manager to engage in a profit-making scheme to manufacture, distribute or transport certain of the most dangerous drugs, such as heroin, cocaine, methamphetamine, LSD or PCP. This offense

15

> distinguishes between lower-level dealers and "mules," and higher-ranking drug profiteers.  Persons convicted of this offense will be subject to a mandatory life term during which they shall be ineligible for parole for a term of 25 years.
>
> [A. Judiciary Comm. Statement to A. 3270 2 (Dec. 18, 1986).]

N.J.S.A. 2C:35-3 makes it a crime of the first degree to be a leader of a narcotics trafficking network.  ("A person is a leader of a narcotics trafficking network if he conspires with two or more other persons in a scheme or course of conduct to unlawfully manufacture, distribute, dispense, bring into or transport in this State" any specified controlled dangerous substance.  "Leader of narcotics trafficking network is a crime of the first degree and upon conviction thereof, . . . a person shall be sentenced to an ordinary term of life imprisonment . . . .").

In State v. Afanador, the defendant challenged the kingpin statute as unconstitutionally vague.  134 N.J. 162, 165 (1993).  Specifically, the defendant argued that the term "organizer," as used within the statute, is susceptible to a number of interpretations that would expand the reach of the statute far beyond the Legislature's intent.  Id. at 171-72.  The defendant claimed that the plain text of the statute would apply to an individual who merely brings together a willing buyer and seller, an outcome that runs

contrary to the Legislature's intent to target "upper-echelon members" of drug trafficking organizations. Id. at 172.

Although this Court noted that "the statute is hardly a model of precise draftsmanship," we reasoned that the "[t]he clear implication of 'organizer,' particularly in a statute dealing with a 'leader' of a drug-trafficking network, is that the term describes a person who exercises some supervisory power over others." Id. at 169, 172. The Court observed that, when read in context with the terms "supervisor, financier or manager," "organizer" denotes authority to direct the actions of others. Id. at 172-73. Accordingly, the Court concluded that the kingpin statute is not unconstitutionally vague. Id. at 173.

After upholding the kingpin statute in Afanador, this Court addressed the adequacy of a jury charge in a kingpin prosecution in Alexander, 136 N.J. 563. The Appellate Division in that case reversed the defendant's conviction under the kingpin statute, reasoning that the trial court failed to instruct the jury that it must find that the defendant was an "upper-echelon member" of the network and failed to define certain critical terms in the statute. Id. at 567. The Appellate Division held that a proper jury instruction should define an upper echelon member "as someone who stands on an upper level of the chain of command of a drug trafficking network, exercising command authority over

17

members of that organization whose status is subordinate to his." Id. at 568

(quoting State v. Alexander, 264 N.J. Super. 102, 111 (App. Div. 1993)).

This Court rejected the definition of "high-level" proposed by the

Appellate Division in Alexander because that definition suggested there must

be a vertical "chain of command" in a drug trafficking network, as part of

which an individual working at the street level or immediately above that

could not be "high-level." Id. at 574-75. The Court explained:

> A "high-level" or "upper-echelon" "leader" of such an organization is one who occupies a significant or important position in the organization and exercises substantial authority and control over its operations. Neither the specific elements enumerated in the provisions of N.J.S.A. 2C:35-3 nor the additional requirements extrapolated from the statute's statement of purpose indicate that a drug operator exercising authority and controlling other people in an organization or network, even at the street level, could not be a "leader" or "drug kingpin" within the contemplation of the Legislature. Rather, the role of a defendant as a leader or drug kingpin turns more on the nature of that person's authority, the magnitude or extent of control, and the number of persons over whom that power is exercised.
>
> [Id. at 575 (emphases added).]

Nevertheless, the Court agreed with the Appellate Division that, in light

of the trial court's instruction as to N.J.S.A. 2C:35-3, "the jury, although it had

convicted defendant, 'did not determine whether defendant's status and

activities warranted the punishment [that] the Legislature has reserved for a

18

"leader of a narcotics trafficking network."'" Id. at 570 (alteration in original) (quoting 264 N.J. Super. at 111).

This Court analyzed the kingpin statute and its "statement of purpose," and more specifically the Legislature's intent to make a defendant's "'upper level' role in a drug network central to the activity criminalized." Ibid. Noting that the statute "does not include some of the important factors used in the statutory statement of purpose to describe the drug-kingpin crime, and, to that extent, does not completely convey the full legislative understanding in creating this crime," the Court remarked that the "status or the position of the defendant in the drug trafficking network is a substantive part of the crime." Ibid.

> a trial court, in a prosecution pursuant to N.J.S.A. 2C:35-3, should instruct the jury that it must find that the defendant occupies a high-level position, that is, a position of superior authority or control over other persons, in a scheme or organization of drug distribution (or manufacture or dispensing or transporting), and that in that position the defendant exercised supervisory power or control over others engaged in an organized drug-trafficking network.
>
> [Id. at 570-71.]

The Court added that "[a]n appropriate instruction should also amplify the other statutory terms that are expressed as material elements of the crime under

19

N.J.S.A. 2C:35-3. Thus, the statutory terms 'organizer, supervisor, financier or manager' should be explained so that the meaning of those terms is more fully understood by the jury." Id. at 575. "For example," the Court wrote, a trial

> court might define an "organizer" as a person who arranges, devises, or plans a drug-trafficking network; a "supervisor" as one who oversees the operation of a drug-trafficking network; a "financier" as one who is responsible for providing the funds or resources necessary to operate a drug-trafficking network; and a "manager" as one who directs the operations of a drug-trafficking network.
>
> [Ibid.]

The model jury charge for the kingpin statute was revised in keeping with Alexander. See Model Jury Charges (Criminal), "Leader of Drug Trafficking Network (N.J.S.A. 2C:35-3)" (rev. Feb. 26, 1996). Notably, a fourth element was added to the description of the offense -- "[t]hat defendant occupied a high level position in the conspiracy." The definitions proposed in Alexander for the terms "organizer," "supervisor," "financier," and "manager" were included in the new instruction's detailed explanation of element three; and the direction quoted above -- that a jury "must find that the defendant occupies a high-level position, that is, a position of superior authority or control over other persons . . . and that in that position the defendant exercised supervisory power or control over others engaged in an organized drug-

20

trafficking network" -- was included in the new instruction's detailed explanation of element four. See ibid.; Alexander, 136 N.J. at 570-71, 575.

The Legislature, in turn, amended N.J.S.A. 2C:35-3 in response to Alexander. See Statement to A. 694 (L. 1997, c. 343) ("The bill is further intended to clarify the recent New Jersey Supreme Court ruling State v. Alexander (decided July 19, 1994). This decision held that in a prosecution under N.J.S.A. 2C:35-3, the trial court should instruct the jury that it must find that the defendant occupies an 'upper echelon' role and in that position exercises supervisory power or control over others engaged in an organized drug trafficking network. These amendments clarify that N.J.S.A. 2C:35-3 is the exclusive source of definition for the offense.").

Before Alexander, the statute provided, as relevant here, that

> [a] person is a leader of a narcotics trafficking network if he conspires with others as an organizer, supervisor, financier or manager, to engage for profit in a scheme or course of conduct to unlawfully manufacture, distribute, dispense, bring into or transport in this State [one or more of the list of prohibited substances].
>
> [N.J.S.A. 2C:35-3 (1995).]

As amended after Alexander, N.J.S.A. 2C:35-3 now reads:

> A person is a leader of a narcotics trafficking network if he conspires with two or more other persons in a scheme or course of conduct to unlawfully manufacture, distribute, dispense, bring into, or transport in this State [one or more of the list of

21

> prohibited substances] as a financier, or as an organizer, supervisor or manager of at least one other person.

The Legislature considered including in the statute that a leader is "an upper echelon member" of a trafficking network, as well as definitions nearly identical to those proposed in Alexander for the terms "organizer," "supervisor," and "manager," but declined to do so. See A. 694 Second Reprint (L. 1997, c. 343) (noting phrases deleted through bill amendments). The Legislature did, however, elect to provide its own definition of "financier" as "a person who, with the intent to derive a profit, provides money or credit or other thing of value in order to purchase a controlled dangerous substance or an immediate precursor, or otherwise to finance the operations of a drug trafficking network." N.J.S.A. 2C:35-3; L. 1997, c. 343.

Following the amendments to N.J.S.A. 2C:35-3, the model jury charge for the kingpin statute was again revised. See Model Jury Charges (Criminal), "Leader of Narcotics Trafficking Network (N.J.S.A. 2C:35-3)" (rev. Oct. 23, 2000). The section quoting the statute was updated, and the definition of "financier" changed from that proposed in Alexander to that adopted by the Legislature. See ibid. The final revised model charge was given nearly verbatim by the trial court in this case as noted above.

This Court has already recognized that the kingpin statute is not the most precise, see Afanador, 134 N.J. at 169, and that jury instructions must provide

22

guidance beyond the words of the statute itself to give effect to the legislative intent behind the statute, as described in N.J.S.A. 2C:35-1.1(c), see Alexander, 136 N.J. at 570-71, 575.  The model jury charge was updated and expanded in light of those determinations, and the revised charge was considered by the Legislature when it revisited the statute.  Ultimately, by considering and declining to incorporate into the statute itself a number of Alexander's requirements, the Legislature left in place the judicial elaboration of the kingpin statute through case law and the model jury charge.

In general, "[i]t is difficult to find that a charge that follows the Model Charge so closely constitutes plain error."  State v. Ramirez, 246 N.J. 61, 70 (2021) (quoting Mogull v. CB Com. Real Est. Grp., Inc., 162 N.J. 449, 466 (2000)).  That is especially true when, as here, the jury charge tracks verbatim a model charge that was explicitly addressed both by this Court and by the Legislature.

We also find no plain error in the trial court's general kingpin instruction, which comports with the statute and interpretive case law.  We turn our attention to the court's response to the jury's request for clarification.

B.

Our law is well-settled on jury questions seeking clarification.  When a jury requests clarification, a trial judge "is obligated to clear the confusion."

23

State v. Savage, 172 N.J. 372, 394 (2002) (citation omitted). If a jury's question is ambiguous, a trial judge "must clarify the jury's inquiry by ascertaining the meaning of its request." Ibid. In other words, "the trial judge is obliged to answer jury questions posed during the course of deliberations clearly and accurately and in a manner designed to clear its confusion, which ordinarily requires an explanation beyond rereading the original charge. The court's failure to do so may require reversal." Pressler & Verniero, Current N.J. Court Rules, cmt. 7 on R. 1:8-7 (2023).

Here, the jury's question was not ambiguous. The jury wanted to know whether it was "possible" to find that the State proved element three but that it did not prove element four. The jury did not probe generally the kingpin instruction. And its reason for seeking clarification was also unambiguous: elements three and four sounded "a little" bit similar. Since the jury question was not ambiguous, the judge was obligated to "clear the confusion" about whether it was "possible" to find three but not four by responding directly with "yes" or "no" to the specific inquiry posed.

We appreciate the trial judge's inclination to reiterate only the words of the model jury charge. Depending on the question posed, many times it is entirely appropriate to do so. But we encourage judges, when the law is clear,

24

to respond directly to unambiguous and specific "yes" or "no" questions from juries during deliberations, rather than simply re-read the final jury charge.

Here, the answer should have been "yes." For a defendant to be labelled a kingpin, the State must prove each of the four elements of N.J.S.A. 2C:35-3 beyond a reasonable doubt. See State v. Bailey, 231 N.J. 474, 483 (2018) ("[C]riminal convictions [must] rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." (quoting United States v. Gaudin, 515 U.S. 506, 510 (1995))). Because the third and fourth elements of the offense must both be proven beyond a reasonable doubt to find a defendant guilty under N.J.S.A. 2C:35-3 -- in contrast to the "financier or organizer, etc." language within the third element -- it is clear that, although both describe the role of the actor as stressed in N.J.S.A. 2C:35-1.1(c), they must be understood as discrete elements, with element four requiring some proof beyond what element three requires. A simple answer of "yes" in response to the jury's clear-cut legal question would have been appropriate here.

Furthermore, in declining to answer "yes," the judge informed counsel that he would re-read the entire charge then "elaborate on that a little bit." Thus, after re-reading the four elements of the offense, the judge stated, "All right, so, you have the 4 elements, 3 and 4 on the surface do they sound

25

similar?  Yeah, I would agree with you.  They sound similar but they are 4 separate elements to this offense and you have to consider each one separately."  Although the judge was correct that each element of the offense must be considered separately, his statement that he "agree[d] with" the jury that elements three and four "sound[ed] similar" could easily have been interpreted to mean that the two require the same proofs, which is not correct.  As the appellate court insightfully pointed out, the judge "unwittingly suggested that being a supervisor is sufficient to establish that a defendant occupied a high-level position within the organization."  Berry, 471 N.J. Super. at 112.  The judge's elaboration, therefore, amounted to plain error.  Cf. State v. Cuff, 239 N.J. 321, 329 (2019) (finding no plain error as to a challenged jury instruction because it "accurately described the State's burden of proof with respect to the elements of" the charged offense and its lesser-included offense).

We conclude the error was clearly capable of producing an unjust result because such a suggestion -- that being a supervisor (element three) is sufficient to establish that a defendant occupied a high-level position (element four) -- could have led the jury to find the State proved defendants were "high-level" leaders merely by proving they were "supervisor[s]."  See State v. Harmon, 104 N.J. 189, 213 (1986) ("Jury instructions must . . . adequately

26

define the offense and cover all the essential elements . . . . The test for plain error related to a jury charge is whether in the circumstances the error possessed a clear capacity for producing an unjust result." (quotation and citation omitted)). If the jury had been told that it could find element three without finding element four, its verdict on the kingpin charges against defendants might have been not guilty. We therefore agree with the Appellate Division that defendants' convictions must be vacated, although for a different reason.

C.

We next address the Appellate Division's conclusion that the trial court should have molded "the jury instructions to address the varying levels of authority of each individual defendant" in the drug trafficking network. Berry, 471 N.J. Super. at 110 n.5. We conclude such tailoring was unwarranted.

The Appellate Division noted that "the model charge does not include language from Alexander that explains, '[a] "high-level" or "upper-echelon" "leader" of such an organization is one who occupies a significant or important position in the organization and exercises substantial authority and control over its operations.'" Id. at 110 (quoting Alexander, 136 N.J. at 575). The appellate court did "not go so far as to rule that this additional language from Alexander must be charged to the jury in all leader cases" but stressed that

"[t]he error in this case was not just the failure to read a few critical words from Alexander but also the failure to mold the jury instructions to address the varying levels of authority of each individual defendant." Id. at 110 n.5. "In the unusual circumstances of this case," the Appellate Division "believe[d] this additional explanatory language was necessary" and that it was plain error not to add it to the charge. Id. at 105 n.3, 110.

The court also

> recommend[ed] that the Model Jury Charge Committee consider the advisability of revising the model instruction for the leader offense to incorporate this language from Alexander or at least to include a footnote or notation explaining that this language in Alexander provides further instruction on what it means to hold a high-level position in the drug trafficking conspiracy.

[Id. at 110 n.5.]

We see no basis for that recommendation. Moreover, in the circumstances of this case, we conclude that tailoring the charge to each defendant was not necessary.

First, the Alexander Court made it quite clear that under N.J.S.A. 2C:35-3, a drug trafficking network "need not have any specific configuration or chain of command." Alexander, 136 N.J. at 575. It was unnecessary for the judge to mold the charge to address respective levels of authority within a hierarchy among defendants in the criminal enterprise. The State charged all

28

three defendants with being leaders.  The final jury charge more than sufficiently explained that the State had to prove each element of the kingpin offense as to each defendant.  Indeed, both in reading the kingpin charge and after re-reading the charge in response to the jury's question, the judge accurately told the jurors,

> you must return a separate verdict for each defendant as to this charge.  In other words, you'll have to decide each case individually, whether the verdicts as to each defendant on this offense are the same or different, depends on the evidence and your determination as judges of the facts.

Second, this was not a protracted trial with substantial conflicting testimony about leadership roles.  The trial took approximately one week, which can hardly be considered drawn out or prolonged.  There was no need to incorporate evidentiary facts into the kingpin charge.  Cf. State v. Concepcion, 111 N.J. 373, 380 (1988) ("Incorporating specific evidentiary facts into a jury charge is especially helpful in a protracted trial with conflicting testimony.").  In addition, the parties may have disagreed over the choice of which facts to incorporate and whether the evidence of such facts was sufficient to be included in the court's charge.

## IV.

Finally, we disagree with the appellate court's reversal of the order denying Berry's motion for acquittal.  When reviewing a motion for acquittal,

29

the question "is whether, viewing the State's evidence in its entirety, . . . and giving the State the benefit of all its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, a reasonable jury could find guilt of the charge beyond a reasonable doubt." Reyes, 50 N.J. at 459. As this Court recently pointed out, "[g]iven the deference afforded a jury verdict, the justification for the grant of a [motion for acquittal] should be clear." State v. Lodzinski, 249 N.J. 116, 158 (2021).

The State's theory of the case against Berry was not that Berry controlled Daniels or Burnett, but that Berry supervised the operation of the narcotics trafficking conspiracy by overseeing at least one other person, that he occupied a high-level position in the organization, and that, in that position, he exercised supervisory power or control over others. The wiretap calls could reasonably be construed to explain the operation of the criminal organization, as well as how Berry supervised subordinates, relayed orders to foot soldiers lower in the chain of command, and took on a supervisory leadership role in light of Daniels' absence. The physical evidence seized when Berry was arrested (including a loaded 12-gauge shotgun, a loaded handgun, over 500 decks of heroin, and over $800 in cash), although not determinative, taken together with the calls, could allow a reasonable jury to conclude that Berry held a high-level position in the network.

Berry placed five of the twenty-four intercepted telephone calls. Those calls show that Berry oversaw the drug trafficking work of at least one person (Bob, who sold drugs and was not a customer) and that Berry exercised supervisory power and control over Bob, Mod (another person who only sold drugs), and Kiersten. In fact, in two different phone calls, Berry told Kiersten that she could "work" another person Berry referred to as the "Indian" and informed her about the price that he usually charged for various types and quantities of narcotics. The calls not only show that Berry relayed orders to foot soldiers lower in the chain of command, but also convey Daniels' insistence that others involved in the criminal enterprise, such as Mod and an individual named Wheezy, needed people "like us . . . that's going to keep it moving" and that Berry needed to "be on" Mod or Wheezy. A reasonable jury could conclude that these conversations establish how Berry would supervise, at a high level, subordinates in the criminal network while Daniels was not around. Therefore, looking at the entirety of the calls a reasonable jury could find Berry guilty of the kingpin charge beyond a reasonable doubt.

The appellate court did not fully recognize the substance of the recorded calls when it reasoned that "it appears that Berry's role essentially was to forward messages and instructions from Daniels, who was incarcerated and thus had limited capacity to communicate directly with persons outside the

31

jail." <u>Berry</u>, 471 N.J. Super. at 103.  The appellate court concluded that "transmitting instructions from other conspirators" did not demonstrate a "high-level supervisory or managerial role" and that the trial evidence "aside from the jailhouse calls" did not support a reasonable inference that defendant held a high level position of authority in the criminal scheme.  <u>Ibid.</u>  This conclusion, however, reduces the calls to conversations solely about transmitting information, while ignoring the concerns expressed by Daniels that Berry needed to "keep it moving" and "be on" others involved in the conspiracy.  A reasonable jury may indeed afford different weight to this evidence.  In light of the full context of the calls, and the physical evidence against Berry, the justification to acquit Berry was therefore far from clear, and the trial court properly denied his <u>Reyes</u> motion.

V.

We affirm as modified the vacation of the kingpin convictions against defendants because the entirety of the trial judge's response to the jury's request for clarification was plain error.  We reverse the appellate court's conclusion that Berry's <u>Reyes</u> motion should have been granted.  We remand for a new trial as to all defendants on the kingpin charge.

32

CHIEF JUSTICE RABNER; JUSTICES PATTERSON, SOLOMON, PIERRE-LOUIS, and WAINER APTER; and JUDGE SABATINO (temporarily assigned) join in JUSTICE FASCIALE's opinion.